[Crim. No. 1624. Fifth Dist. Mar. 20, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL ALVIN FUSSELMAN, Defendant and Appellant.

**COUNSEL**

Marsha B. Shanle, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Marjory Winston Parker, Kevin M. Corrington and Joel E. Carey, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FRANSON, J.**—By indictment, the Kern County Grand Jury charged appellant with the murders of his two children, aged four and three years. He entered pleas of not guilty and not guilty by reason of insanity. Three psychiatrists were appointed to examine appellant and investigate his sanity. At trial appellant was found guilty of two counts of first degree murder; thereafter, the jury found he was sane at the time both murders were committed. Appellant's motions for a new trial and for reduction of

the degree of the crime were denied and he was sentenced to concurrent life terms in the state prison.

## CASE-IN-CHIEF

At the time of the charged offenses appellant was 52 years old and his third marriage was heading toward dissolution. His wife was 38; this was her second marriage. Because of the serious asthmatic condition of appellant's three-year-old daughter, he and the daughter, Danielle, had spent six months preceding the offenses in Denver seeking special treatment for her condition. The four-year-old son, Danny, had remained with his mother in Bakersfield.

In December of 1971, after appellant had returned with his daughter to Bakersfield, his wife served him with divorce papers. He returned to Denver and then went to Phoenix to visit a son of a prior marriage. He finally returned to Bakersfield on March 7, 1972.

At 9:45 a.m. on March 9, 1972, appellant entered the Kern County Sheriff's office and said he wanted to turn himself in for killing his children earlier that morning. Officers sent to appellant's home discovered that the furniture in the house had been slashed. In his wife's bedroom the mattress of the bed had been cut open, a radio had been smashed, and her clothing, which was still hanging in the closet, had been slashed. Her lingerie in the dresser had been cut and bleach had been poured over it. The shafts of her golf clubs had been broken and then replaced in the golf bag. The officers discovered the blood-stained bodies of the children in their beds in the other bedroom.

Priscilla Putnam, appellant's wife,[1] testified that appellant had contacted her on Tuesday evening, March 7, 1972. At that time she was working the 4 p.m. to midnight shift at Tiny's Restaurant as a waitress and in addition, she would usually stay three or four hours later to do the bookkeeping. When appellant contacted her they discussed the property settlement but not the children. Mrs. Putnam told appellant that he could have anything he wanted and that if he decided he wanted their property she wanted child support, but that if he would deed all the property to her she would not ask him to pay child support in addition. She told appellant that he should come over to the house the next day to see the children.

---

[1] Appellant and Mrs. Putnam were divorced at the time of trial.

On March 8, 1972, appellant arrived at the house and spent the day with the children. Mrs. Putnam had planned to take the children to the babysitter as usual on the evening of March 8 while she was at work but Danny suggested that appellant could babysit them. Mrs. Putnam agreed to this, and she went to work as usual.

Mrs. Putnam testified that during their marriage she had seen appellant consume considerable amounts of alcohol. On one occasion she saw him drink two fifths of brandy over a period of eight hours and he was still able to carry on an intelligent conversation.

Appellant had insinuated in letters that he had previously written to her that she was having affairs with several men, but he never mentioned it to her directly and they never discussed these alleged affairs. Among the people with whom he suggested that she had had affairs were her employer, and a Bakersfield police officer related to Mrs. Putnam by a prior marriage. Mrs. Putnam denied having had any affairs.

At 10:30 a.m. on March 9, 1972, appellant gave a tape-recorded statement to the police which was admitted into evidence without objection and was played for the jury. Appellant told the police that he had been living in Denver and Phoenix since he had separated from his wife in December 1971, and that he had arrived in Bakersfield on March 7, 1972. He said they discussed the property settlement and he said she told him that she needed the money from their property to take care of the children and that he would not have to pay any child support if she got the property. Appellant told her he thought it was very unfair and that he should at least have the children.

Appellant's March 9 statement related the following sequence of events: after visiting with the children all day March 8, he bathed the children and put them to bed at about 9 p.m. He then took a nap and woke up at about 1 a.m. on March 9. After he woke up he began to think about the fact that his wife was going to take everything and he decided that if she wanted everything she could have it but there wouldn't be anything left when he got through with it. He obtained a knife and cut up all the furniture and all of his wife's clothes. He had finished slashing the clothes and the furniture by about 3 a.m.

Appellant then sat around for a little while longer and got to thinking about some remarks Danny had made. There was a six-pack of beer in

the icebox and appellant drank the beer. The more he got to thinking about the way his wife was acting and the way she treated little Danny, he decided that if he could not have the children and the law was not going to let him have the children, no one else was going to have them; he would get rid of them.

Between 4 and 5 a.m., after making this decision, appellant took a skillet and a butcher knife, went into the children's bedroom, and hit Danny with the skillet and cut his throat; he then hit Danielle with the same skillet and cut her throat. Appellant dropped the skillet in the bedroom and washed off the knife and put it back into the drawer.

A second, voluntary, tape-recorded statement was taken from appellant on March 10, 1972, and was admitted into evidence without objection and played for the jury. In this statement appellant said that he drank the beer before he cut up the furniture. In addition, appellant said in his second statement that he was cutting everything up and the next thing he knew he was in the children's bedroom. He said he didn't intend to hurt the children. He told the police on this occasion that he did not remember what happened.

After killing the children appellant stayed in the house and wrote two notes to his wife. The first note was addressed jointly to Mrs. Putnam and her employer; in this note appellant said that he wished his wife the best of bad luck, nightmares always, and told her that "here is the property and the blood of your children." The second note was addressed to his wife only, and said: "This divorce I hope you enjoy and remember all your life, you wanted it so bad that you lied, cheated and to your own son, also to your daughter. Like I said when I went to Denver I only wanted happiness for the children, but you were God, everybody was a liar, a scum and wrong, so good, you are now God. He gave his only son and you gave a son and a daughter." Appellant went on to mention his wife's alleged affairs, and he told her that she did not need or deserve the children and closed with the words, "I hope for you the worst always."

In both of his taped statements to the police, appellant said that, after writing the notes, he left the house and drove around for a while. He returned and parked his car close to the house and waited until his wife came home at about 8:30 or 9 a.m. because he wanted her to come home and open the door and see what she was getting and see that he had killed the children so that she would remember it all her life; after he

saw her drive up to the house he went to the sheriff's office and turned himself in.

## DEFENSE

The major thrust of the defense was the claim of diminished capacity. The defense sought to establish that at the time of the killings appellant did not have the requisite mental state for murder because of temporary mental illness and also because of unconsciousness caused by voluntary intoxication.

A clinical psychologist, Dr. McCreary, testified that he had given appellant a number of psychological tests in June 1972. He described appellant as a passive-dependent personality, a person who tended to suppress his feelings and hostility. He also concluded from the tests that appellant had the personality pattern associated with abusive misuse of alcohol. He concluded that appellant, at the time of the homicides, suffered from "impaired reality testing" and was not aware of what was going on or the consequences of his actions.

A court-appointed psychiatrist, Dr. Burdick, examined appellant in April 1972, and again in December 1972, for a total time of 2 hours and 45 minutes. He related a summary of the events as appellant had described them to him, and described appellant as a "mild-mannered" man who repressed hostility. He concluded that appellant, at the time of the homicides, did not have the capacity to appreciate the nature of the act that he was committing, could not comprehend that the law prohibited what he was about to do, could not form the intent to kill the children, and could not reflect upon his act and the gravity of its consequences.

Dr. Verin, a psychiatrist contacted by defense counsel, saw appellant in June 1972, for a total of 6 hours and 15 minutes. He gave a summary of the events and a brief family history he had obtained from appellant. Aided by the results of Dr. McCreary's tests, he concluded that at the time of the homicides appellant was in a psychotic rage; he had lost all ability to distinguish what was what, and was out of contact with reality. He concluded that appellant was not able to plan to kill the children, and was not able to maturely reflect on the nature of his act.

Appellant testified in his own behalf. He said that when he arrived in Bakersfield and spoke with his wife she was very belligerent and arrogant

and in talking about the divorce settlement she said she was going to take everything and ask for child support in addition.

He said that when he bathed the children on Wednesday evening, March 8, he noticed that Danielle had a large scratch mark on the side of her face. He said Danny told him that their mother gave Danielle that scratch mark and that when Danielle got sick Mrs. Putnam would take her in the bedroom and spank her face until she bled. Danny told appellant that his mother had told him (Danny) that if appellant asked anything about why Danielle's face was swollen that Danny was supposed to say that Danielle had the mumps. Appellant said the children begged him to take them back to Colorado with him and they told him how mean their mother was and how she would not take care of them.

Appellant said that a little after midnight on March 9, 1972, he was awakened by the telephone. The voice on the telephone sounded like the voice of a person that had telephoned him two or three times in Denver on which occasions the person made insinuating remarks. On March 9, 1972, the person said, "Well, you are suckered again, now you don't even get to see your children when you want them."

Appellant said that he drank five 16-ounce cans of beer and then began to think about how arrogant and belligerent his wife had been that day. He decided to pack the children's clothes and take them to Denver. While he was looking for a suitcase, he came upon his wife's golf clubs. He began to get mad thinking about how much he had paid for them and how she didn't use them. He then destroyed the clubs, his wife's other possessions and the furniture. After destroying these articles, he testified that he did not remember what happened until he was washing blood off the knife, and then he discovered his children's bodies.

Appellant recounted the incident when he had drunk two fifths of brandy, but he insisted that beer had twice the effect on him that hard liquor did and that he could get "very loaded" on a six-pack of beer.

Appellant said the reason he waited around his house for his wife to return after the killings was that he was going to tell her not to go into the house; he said he was going to tell her what he had done and that he was on his way to the sheriff's department to turn himself in. He stated that his March 9 statement was not a relation from actual memory as to what had occurred and what he had been thinking at the time of the crime,

but was only a reconstruction from the evidence he found after he came back to reality of what must have happened. He said that he could recall from his actual memory the destruction of the clothing and the furniture but not the destruction of his children.

## Rebuttal

The prosecution called Dr. Perelli-Minetti, a court-appointed psychiatrist who had examined appellant on two days in April 1972 for a total of an hour and 35 minutes. He gave a summary of events as related to him by appellant (which was substantially the same as that given by Drs. Burdick and Verin). He agreed with Dr. McCreary's characterization of appellant as a passive-dependent person. His conclusion was that while appellant had problems with his personality, tried to push his feelings down and had difficulty asserting himself and his anger, he was not psychotic. He felt that appellant was aware of what was happening at the time of the killings, and that he was capable of understanding, planning and premeditating. He felt there were indications of some impairment with appellant's contact with reality but that there was no doubt that he understood his act.

The prosecution also called, on rebuttal, a psychiatrist, Dr. Cutting, who had examined appellant in April 1972, for about an hour-and-a-half. He concurred that appellant had a passive-dependent personality. He felt that appellant was essentially sane and in possession of his faculties the night of the homicides and that he had been able to plan and premeditate.

## Error In Instructions

An instruction based on *People* v. *Conley,* 64 Cal.2d 310, 324-326 [49 Cal.Rptr. 815, 411 P.2d 911], footnote 4,[2] was requested by defense counsel and refused by the trial judge. The proposed instruction read: "The law prohibits acts highly dangerous to human life that cause serious injury or death, unless legal cause or excuse is shown. Malice aforethought, either express or implied, is manifested by the doing of such an act by a person who is able to comprehend this prohibition and his obligation to conform his conduct to it. There is a presumption that the defendant was able to understand this prohibition but he may rebut

---

[2]The murder-manslaughter/diminished capacity instructions suggested in *People* v. *Conley, supra,* are set forth in the Superior Court Criminal Trial Judges "Deskbook" 1972 edition, pages 356cc-356dd; and 1973 edition, pages 426-430.

the presumption by evidence of diminished capacity on which I shall instruct you shortly."

■ The mental state constituting malice aforethought does not presuppose or require any ill will or hatred of the particular victim. (*People* v. *Conley, supra,* at p. 321; *People* v. *Bender,* 27 Cal.2d 164, 180 [163 P.2d 8].) When a defendant "with wanton disregard for human life does an act that involves a high degree of probability that it will result in death" he acts with malice aforethought. (*People* v. *Conley, supra,* p. 321; *People* v. *Washington,* 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130].)

■ The mental state of "malice aforethought" must be distinguished from that state of mind described as "wilful, deliberate and premeditated." The latter phrase encompasses the mental state of one who carefully weighs the course of action he is about to take and chooses to kill his victim after considering the reasons for and against it. (*People* v. *Sedeno,* 10 Cal.3d 703, 722 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Conley, supra,* at p. 322.) While difficult to comprehend, the law recognizes that a person may deliberate, premeditate and intend to kill his victim, yet not act with malice aforethought so that the maximum offense of which he could be found guilty would be voluntary manslaughter. (*People* v. *Sedeno, supra,* at p. 723; *People* v. *Conley, supra,* at p. 318; *People* v. *Henderson,* 60 Cal.2d 482, 490-492 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Gorshen,* 51 Cal.2d 716, 732 [336 P.2d 492]; *People* v. *Bender, supra,* 27 Cal.2d 164, 180.)

■ In *People* v. *Conley, supra,* at page 322, it is held that the statutory definition of both express and implied malice[3] includes an *awareness of the obligation to act within the general body of laws regulating society.* If, in spite of such awareness, a defendant does an act that is likely to cause serious injury or death to another, he exhibits that wanton disregard for human life or antisocial motivation that constitutes malice aforethought. (For example, one who commits euthanasia bears no ill will towards his victim and believes his act is morally justified but he nonetheless acts with malice if he is able to comprehend that society prohibits his act regardless of his personal belief. (*People* v. *Conley, supra,* at p. 322.)

---

[3]Penal Code section 188 provides: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

On the other hand, if, because of mental defect, disease or intoxication, the defendant is unable to comprehend his duty to govern his actions in accord with the law, he does not act with malice aforethought and cannot be guilty of murder.[4]

■ If there is introduced any evidence deserving of consideration that the defendant lacks any of these mental states (malice aforethought, premeditation, deliberation and intent to kill), he is entitled to an instruction on the effect of this lack of mental state. (*People* v. *Conley, supra,* at p. 319; *People* v. *Modesto,* 59 Cal.2d 722, 729 [31 Cal.Rptr. 225, 382 P.2d 33]; [overruled on other grounds in *People* v. *Sedeno, supra,* 10 Cal.3d 703, 721; *People* v. *Morse,* 60 Cal.2d 631, 649 (36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810)]; *People* v. *Carmen,* 36 Cal.2d 768, 772-773 [228 P.2d 281].) Such an instruction is "necessary for the jury to be fully and fairly charged upon the relevant law" and must be given by the court on its own motion. (*People* v. *Conley, supra,* p. 319; *People* v. *Henderson, supra,* 60 Cal.2d 482, 490-491.)

■ It was incumbent on the trial judge in the present case to fully define for the jury the particular mental states required for the crimes of first degree murder, second degree murder and voluntary manslaughter. Thus, the court erred in refusing to give the requested instruction that

---

[4]*People* v. *Conley, supra,* illustrates this rule by reference to *People* v. *Gorshen* (51 Cal.2d 716, 723), *supra*: "The situation of an individual who kills with intent, deliberation, and premeditation, but without malice aforethought is illustrated by the evidence in the *Gorshen* case. Had the trial court in that case believed the defendant's testimony, it might have concluded that he acted without malice when, after an altercation with his foreman and after consuming a large quantity of alcohol, he went to his home, got his pistol, fired a shot in his living room, drove back to his place of employment, and then after being searched by two police officers (who did not find his gun) and while still in their company shot the foreman. The psychiatric expert urged that because of personality disintegration and paranoic schizophrenia the defendant believed the act necessary to prevent his own insanity and that the defendant was incapable of having the 'mental state which is required for malice aforethought, or premeditation or anything which implies intention, deliberation, or premeditation.' [Citation.] The defendant had testified that he had forgotten about 'God's laws and human's laws and everything else.' [Citation.] Confronted with this evidence, the court or a jury could conclude that the defendant killed intentionally, with premeditation and deliberation, but did not do so with malice aforethought. Although legally sane according to the M'Naughton test, such a defendant could not be convicted of murder if mental illness prevented his acting with malice aforethought. [Citation.] Similarly in the present case, the jury could have found that although defendant deliberated and premeditated the killings, his intoxication and mental disorder precluded malice aforethought. In finding him guilty of first degree murder under the instructions given it therefore did not necessarily determine that he acted with malice aforethought." (*People* v. *Conley, supra,* 64 Cal.2d pp. 322-323.) (See also *People* v. *Sedeno, supra,* 10 Cal.3d 703, 723.)

malice aforethought, either express or implied, is manifested by the doing of an act by a person who is able to comprehend his obligation to act within the law. (*People* v. *Conley, supra,* at p. 324, fn. 4.)

## THE ERROR IS PREJUDICIAL

In *People* v. *Poddar,* 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342], the defendant was accused of first degree murder, interposed a defense of diminished capacity and was convicted of second degree murder. At trial, defendant had requested the *Conley* instruction, but it was refused. The Supreme Court reversed because it concluded that without the instruction, the diminished capacity defense was not related specifically to the implied malice instructions that were given, even though the trial court had instructed generally that malice may be negated by a finding of diminished capacity.[5]

"We do not dispute that, to the extent the jurors were advised by the court, the instructions were legally correct and accurate. The vice of the instructions, however, is that they stopped short of being full and complete and failed to advise [the jury] as to the precise finding or findings, after a threshold finding of diminished capacity, which must be made prior to a determination that defendant acted with malice aforethought." (*People* v. *Poddar, supra,* at p. 759.)

"At no time [was the jury] specifically told that the evidence of diminished capacity was directly applicable to the questions of whether defendant was both aware that he must act within the law, and that he acted despite such awareness. The resolution of these issues, moreover, involved the focus and thrust of defendant's voluminous evidence of diminished capacity. The instructions as given thus failed to serve the needs of the jurors to understand and properly apply the evidence of diminished capacity to the underlying issues. The result was the jury could have found malice without giving proper weight to evidence presented in support of a crucial defense, and the court erred by its refusal to instruct in more specific terms." (10 Cal.3d at pp. 760-761.)

In the present case, like *Poddar,* the jury was not specifically told that the evidence of diminished capacity was directly applicable to the questions of whether the defendant was aware of his duty to act within

---

[5]In *Poddar* and in the present case, the jury was instructed on implied malice in terms of CALJIC Nos. 8.11, 8.31 and 8.77 as those instructions then read.

the law and whether he acted despite such awareness. Under *Poddar,* this omission must be deemed prejudicial even though the trial court had instructed generally that malice may be negated by a finding of diminished capacity.

■ Respondent makes several contentions as to why the *Poddar* rationale does not require reversal of the present case. First, it is contended that the substance of the *Conley-Poddar* definition of malice as it relates to diminished capacity was given in this case. After the trial judge refused to give the *Conley* instruction, he granted defense counsel's request to modify CALJIC No. 4.25 (relevance of voluntary intoxication to knowledge) to read in part as follows:

"In the crime of murder of which the defendant is accused . . . a necessary element is the existence in the mind of defendant of knowledge that the law prohibits the act of killing and the defendant must conform himself to that prohibition.

"If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such knowledge." Respondent argues that this instruction was similar to that required by *Poddar.* It is clear, however, that a major thrust of appellant's defense of diminished capacity went to his entire personality and not merely his mental state as a result of intoxication. The instruction does not relate diminished capacity resulting from an abnormal mental condition, other than from intoxication, to the elements of implied malice as required by *Poddar.* (10 Cal.3d at p. 760.)

■ Respondent next contends that the *Poddar* rationale is inapplicable because in *Poddar* the court noted that the conviction of second degree murder presumably was based on evidence of *implied* malice, whereas, in this case, respondent argues there is compelling evidence of express malice. In *Poddar,* the court stated in footnote 11: "The record discloses no compelling evidence of express malice and we must presume that the verdict of second degree murder could have been based on a finding of implied malice. The verdict, accordingly, must be justified, if at all, on the propriety of such a finding." (10 Cal.3d at p. 758.)

An argument could be made that the *Conley-Poddar* instruction

(acting despite an awareness that the law prohibits the act) must be given only in implied malice cases because the various definitions of implied malice, i.e., "where the circumstances attending the killing show an abandoned and malignant heart" (Pen. Code, § 188), or the doing of an act with wanton disregard for human life "that involves a high degree of probability that it will result in death" (*People* v. *Washington,* 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130]), do not state that implied malice involves *unlawfulness,* whereas the statutory definition of express malice is the manifested deliberate intention to *unlawfully* take a human life (Pen. Code, § .188). The revisions made in CALJIC instructions, Nos. 8.11 and 8.77 to reflect the directive of *People* v. *Poddar, supra,* draw this distinction; the use note to CALJIC No. 8.11 states that in a premeditated first degree murder case, the jury need only be instructed in terms of the statutory definition of express malice and not in terms of the *Conley-Poddar* instruction.

This distinction is not warranted. The mere fact that the term "unlawfully" appears in the statutory definition of express malice does not obviate the need for an instruction that clearly relates the defense of diminished capacity to the comprehension of the requirements of the law. "An awareness of the obligation to act within the [law] is included in the statutory definition of implied malice in terms of an abandoned and malignant heart *and* in the definition of express malice as the deliberate intention to unlawfully take life." (*People* v. *Conley, supra,* 64 Cal.2d at p. 322. Italics added.)[6]

█    Finally, apart from the *Conley-Poddar* error, the trial court failed to correctly instruct the jury on the relationship of the diminished capacity defense to the specific intent required for first degree murder and voluntary manslaughter. After advising the jury that it must determine if the defendant was suffering from some abnormal mental or physical condition which prevented him from forming the specific intent essential to constitute the crime or degree of crime with which he is charged, it instructed that in the crime of "murder," a necessary element

---

[6]In any event, the failure to give the *Conley* instruction was prejudicial to appellant whether or not the *Poddar* rationale is applicable to a theory of express malice. From the record it is clear that the jury could have based its verdict on implied malice. Appellant testified that his admissions contained in the March 9th statement to the effect that just before the killings he decided that if the law wouldn't let him have his children, no one else was going to have them—he would get rid of them—were not based on his actual recollection of the events, but on a reconstruction of what he felt he may have thought and done. The jury may have believed his testimony and found implied malice from the nature of the acts and circumstances attending the killings.

is the existence in the mind of the defendant of the specific intent to "commit murder." It also instructed that if the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if he had the specific intent "to commit murder." These instructions are erroneous on their face as the intent which is required for first degree murder, as well as voluntary manslaughter, is to kill; we know of no judicially recognized mental state of an intent "to murder." The trial court also erroneously instructed the jury in the language of CALJIC No. 3.31, "concurrence of act and specific intent" by again advising that in the crime of murder there must exist in the mind of the perpetrator the intent "to commit murder."

Because our Supreme Court has termed the defense of diminished capacity a "crucial" one (*In re Saunders*, 2 Cal.3d 1033, 1049 [88 Cal.Rptr. 633, 472 P.2d 921]; *People* v. *McDowell*, 69 Cal.2d 737, 750-751 [73 Cal.Rptr. 1, 447 P.2d 97]) it is incumbent on the trial court to instruct on the defense in clear and certain language; this was not done.

The judgments of conviction are reversed.

Gargano, Acting P. J., and Thompson, J.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 28, 1975.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.