[Crim. No. 18718. First Dist., Div. Two. Dec. 10, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKY ALLEN CARPENTER, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Frances Ternus, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Karl J. Phaler, Jay M. Bloom and Jesus Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TAYLOR, P. J.**—Defendant, Ricky Allen Carpenter, appeals from a judgment of conviction entered on a jury verdict finding him guilty of first degree murder (Pen. Code, § 187), petty theft (Pen. Code, § 484) and use of a knife (Pen. Code, § 12022, subd. (b)). He contends that: 1) the prosecution committed prejudicial misconduct in the opening argument; 2) the court erred by giving an incomplete instruction on diminished capacity; and 3) pursuant to Penal Code section 4019, he was entitled to an additional "good time" credit of 94 days for presentence time served. We have concluded that the judgment must be affirmed, but remanded for a recalculation of good time/work time credits.

The record reveals the following pertinent facts: In January 1978, defendant was 18 years old and living with his mother, Mrs. DiMascio, who was then separated from his stepfather. On the morning of January 15, 1978, defendant was picked up by a friend, L. Shoemaker; they proceeded to the home of another friend, R. Tripp, to watch the Super Bowl game on television. Before they left, defendant took three valium pills. They took along a case of beer. Defendant drank between one and two 6-packs while watching the game.

After the game, defendant and Shoemaker returned to defendant's home around 7 p.m. Defendant's mother and sister came home briefly but then left again. Although defendant was a little drunk, no one noticed anything unusual about him, except that he had a cold and sore throat.

About 8 p.m., defendant put on a pair of gloves and went next door to the home of Mrs. Evelyn Bentley. He told her that his telephone was out of order and asked to use her telephone. Mrs. Bentley reluctantly let him in and went into her bedroom to get the telephone. Defendant followed her. As Mrs. Bentley returned with the telephone, defendant hit her in the eye with his fist and knocked her to the floor. Defendant then began to smother her with his hands until she became unconscious. Defendant then became worried about getting caught, as he thought Mrs. Bentley would call the police; he went to the kitchen to get a knife, returned and stabbed Mrs. Bentley in the chest. When she fought back, he pulled the knife out of her chest and stabbed her in the neck, killing her. Afterwards, defendant saw Mrs. Bentley's purse in her room; he opened it and took about $40 from her wallet.

Defendant then returned home. He took off his shoes, washed off the blood, threw away the gloves and put the clothes he had been wearing into the washing machine. He then lay back on the couch and "started thinking about it." About 10 p.m., he called his mother and asked her to bring him ice cream. He then fell asleep.

Mrs. DiMascio returned around 11 p.m. As she was a good friend of Mrs. Bentley's, Mrs. DiMascio began to worry when she noticed that Mrs. Bentley's front door was open and the lights still on. Mrs. DiMascio knew that Mrs. Bentley was a safety-conscious person; she tried to telephone her but there was no answer. Mrs. DiMascio also unsuccessfully tried to awaken defendant so he could accompany her next door.

The next morning, Mrs. DiMascio again telephoned Mrs. Bentley; still there was no answer. Accompanied by another neighbor, D. Miller, Mrs. DiMascio looked in Mrs. Bentley's house. Both became very upset and called G. Dawes, another neighbor, to the scene. Dawes discovered Mrs. Bentley's body and tried to call the police but found that the telephone cord had been disconnected.

During the police investigation of the murder, defendant was interviewed. He waived his *Miranda* rights and then admitted killing Mrs. Bentley. He described the entire event, indicating that "something came over" him. Defendant did not like the victim as she frequently came over and he believed that she was trying to tear defendant's family apart by encouraging his mother not to get back together with his stepfather. Defendant stated that he hated Mrs. Bentley. At the time he stabbed Mrs. Bentley, he knew that he was going to kill her.

At trial, defendant did not testify but relied on a diminished capacity defense predicated on his bad childhood experiences and educational difficulties: His mother and father lived together for a total of one year during their six-year marriage; defendant was sent to live with his grandparents for about two years while his mother was in San Francisco. By the time defendant was 10 years old, he had attended 6 different schools. He was classified as educationally handicapped and eventually dropped out of high school; he had also been described by the school psychologist as depressed. Also, there were incidents of violence and arguments at his home.

Defendant's expert witness, Dr. Pirofsky, a psychiatrist, testified that the alcohol and valium consumed by defendant did not *cause* an "altered state of consciousness" but were the triggering reaction. Dr. Pirofsky believed that at the time of the offense, defendant was incapable of harboring malice and unable to form an intent to kill.

However, Dr. Harper, a court-appointed psychiatrist, testified that defendant was capable of harboring malice aforethought and able to form the specific intent to kill at the time of the murder.

Defendant first contends that the prosecutor was guilty of prejudicial misconduct during his opening argument. In describing the difficulties the police had in solving the killing of Mrs. Bentley, the prosecutor said: "The police have suspects. They have no hard evidence pointing to the suspect. Perhaps it would be wise to exclude suspects.

"And so they call in a man by the name of William Sheeve, California Department of Justice Polygraph Operator." The prosecutor, however, did not mention that a polygraph test had actually been given or the results of any specific test.

As the results of a polygraph test are not admissible at trial (*People v. Schiers,* 19 Cal.App.3d 102, 108 [96 Cal.Rptr. 330]; *People v. Aragon,* 154 Cal.App.2d 646 [316 P.2d 370]) defendant maintains that the only implication the jury could draw from the above quoted statement was that defendant had taken and failed a polygraph test. The ultimate question before us, however, is whether the conduct of the prosecutor was prejudicial, namely, whether after a review of the entire cause it is reasonably probable that a result more favorable to defendant would have occurred had the prosecutor refrained from the comment (*People v. Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; *People v. Paul,* 78 Cal.App.3d 32, 39 [144 Cal.Rptr. 431]). Given the record before us, we do not think so. The prosecutor's statements did not attack the credibility of defendant or discredit any testimony, as defendant did not testify at trial. Defendant admitted that he had killed Mrs. Bentley and his counsel so stipulated in chambers. The only issue before the jury was defendant's diminished capacity. Under the circumstances, any reasonable jury would have reached the same verdict, even in the absence of the prosecutor's remarks (*People v. Bolton,* 23 Cal.3d 208, 214 [152 Cal.Rptr. 141, 589 P.2d 396]; *People v. O'Brien,* 61 Cal.App.3d 766, 779 [132 Cal.Rptr. 616]).

In both *Schiers, supra,* 19 Cal.App.3d 102, and *Aragon, supra,* 154 Cal.App.2d 646, cited by defendant, the defendants denied involvement in the crime charged. Thus, the prosecution's introduction into evidence of the results of the adverse lie detector test discredited their testimony and was prejudicial.

Further, the record reveals that the term "polygraph" was used only once. Defense counsel immediately objected and the court immediately admonished the jury, as set forth below,[1] to disregard the prosecutor's remarks. Accordingly, the prosecutor's remark was so brief and of such a general nature that any effect had on the jury is deemed to have been

---

[1] "Ladies and gentlemen, the word polygraph has been mentioned, and I wanted to instruct you that the term polygraph used by the district attorney in the title of Mr. William Sheeve where he referred to him as a polygraph operator is not indicative of any inference that evidence of a polygraph test will be introduced during the trial."

cured by the prompt admonition (see, e.g., *People* v. *Paul, supra,* 78 Cal.App.3d, p. 39; *People* v. *O'Brien, supra,* 61 Cal.App.3d, p. 779; but see, e.g., *People* v. *Schiers, supra,* 19 Cal.App.3d, pp. 113-114).

Defendant, however, maintains that here, the matter was compounded by additional questionable conduct by the prosecutor. He points out that the prosecutor in his opening remarks never once prefaced his remarks with the words "the evidence will show," and that the court had already chided the prosecutor for showing a large unadmitted photograph of the victim during his opening argument, but made it clear that he would not grant a mistrial for the purposes of teaching the prosecutor a lesson. Subsequently, in chambers, the court asked the prosecutor to refrain from interrupting the defense psychiatrist when he was testifying and also to refrain from replying sarcastically to the court. Defendant further complains that the prosecutor in his closing argument referred to some gruesome details of the Tate/LaBianca murders, but concedes that reference to notorious cases is generally acceptable. We conclude that the above occurrences did not deprive defendant of a fair trial.

██ Defendant's second contention is that the trial court erred in failing to fully instruct the jury on the definition of diminished capacity. Specifically, he asserts that the court did not instruct the jury that the evidence of diminished capacity was directly applicable to a question of whether or not defendant was aware of his duty to act within the law and whether defendant acted despite such awareness. Defendant complains of the following modified version of CALJIC No. 8.77: "If you have a reasonable doubt whether he was able to form an intention unlawfully to kill a human being, you cannot find that he harbored malice." Citing *People* v. *Poddar,* 10 Cal.3d 750, 757-758 [111 Cal.Rptr. 910, 518 P.2d 342], and *People* v. *Conley,* 64 Cal.2d 310, 316, 319 [49 Cal.Rptr. 815, 411 P.2d 911], he maintains that the above quoted instruction should have read as follows: "If you have a reasonable doubt [1] whether he was able to form an intention unlawfully to kill a human being, or [2] *whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death, or* [3] *whether he did act despite that awareness,* you cannot find that he harbored express malice."

The People assert that their case was predicated only on express malice, and it was not necessary to also prove implied malice. ██ However, an awareness of the obligation to act within the general

body of laws regulating society is included in the statutory definition[2] of implied malice *and* in the definition of express malice (*People* v. *Conley, supra,* 64 Cal.2d, p. 322; *People* v. *Fusselman,* 46 Cal.App.3d 289, 299 [120 Cal.Rptr. 282]).

▮ But, the instant facts indicate that there was no issue as to defendant's awareness of his duty to act within the law and whether or not he acted despite such awareness. In defendant's narrative of the homicide, he admitted that he knew it was wrong to kill another human being and that he knew that he could be punished for killing another human being. After he became worried that he was "going to get caught," he went to the kitchen and got the knife. When he stabbed Mrs. Bentley in the chest, he knew that he was going to kill her.

Defendant presented no evidence that he was unaware of his duties under the law. To the contrary, his expert witness testified that he knew he was stabbing the victim and he knew generally when you stab someone there is a very great likelihood that you are going to kill that person. Thus, here, unlike the authorities cited by defendant (*People* v. *Poddar, supra,* 10 Cal.3d 750; *People* v. *Conley, supra,* 64 Cal.2d 310; *People* v. *Fusselman, supra,* 46 Cal.App.3d 289), there was no issue as to whether defendant was aware of his obligation to act within the law. A trial court is required to instruct *sua sponte* only on the general principles of law relevant to the *issues* raised by the evidence. The general principles of law governing the case are those principles closely and openly connected with the *facts* before the court, and which are *necessary* for the jury's understanding of the case (*People* v. *Hood,* 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370]; *People* v. *Pijal,* 33 Cal. App.3d 682, 695 [109 Cal.Rptr. 230]).

The record here indicates that the trial court gave proper instructions on the general principles of law relevant to issues raised by the evidence, including that diminished capacity can negate the existence of every specific mental state essential to the commission of the offense, including malice aforethought.[3]

---

[2]Penal Code section 188 provides: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

[3]The pertinent parts read: "Also, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental state constituting malice aforethought you cannot find him guilty of murder of either the first or second degree.

The instructions were complete as they served the needs of the jurors to understand and properly apply the evidence of diminished capacity to all of the underlying issues (but see, *People v. Poddar, supra,* 10 Cal.3d, pp. 760-761; *People v. Conley, supra,* 64 Cal.2d, p. 320; *People v. Fusselman, supra,* 46 Cal.App.3d, pp. 301-302).

Finally, defendant argues that pursuant to the 1978 amendment to Penal Code section 2900.5, subdivision (b), he was entitled to an additional 94[4] days of presentence credit for days credited to the period of confinement pursuant to Penal Code section 4019. The relevant portions of the statute provide that a defendant committed to county jail shall receive separate credits for work time and good time "unless it appears by the record" that he either "has refused to satisfactorily perform labor as assigned" or "has not satisfactorily complied with [established] rules and regulations" (Pen. Code, § 4019, subds. (b) and (c)).

At the time here pertinent, former Penal Code section 190 (Stats. 1977, ch. 316, eff. Aug. 11, 1977, subsequently amended and repealed in 1978) provided, so far as pertinent, that first degree murder was punishable by imprisonment for life. As defendant received a life sentence for a crime committed, the good time/work time credits cannot be used to reduce the maximum term. ■ Penal Code section 3046 provides, so far as pertinent: "No prisoner imprisoned under a life sentence may be paroled until he has served at least seven calendar years." Thus, the good time/work time credits cannot be used to reduce the minimum eligible parole date (MEPD).

The question, however, remains as to whether the work time/good time credits can be used to shorten the term set by the Community Release Board after the MEPD and prior to parole. Penal Code section 2900.5, subdivision (c), so far as pertinent, indicates that "'term of imprisonment' includes... any period of imprisonment and parole, prior to discharge, whether established or fixed by statute...." The Community Release Board also administratively gives postconviction credit to

"If you have a reasonable doubt whether he was able to form an intention unlawfully to kill a human being you cannot find that he harbored malice.

"Furthermore, if you find that as a result of mental illness, mental defect or intoxication his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed you cannot find him guilty of either murder or voluntary manslaughter."

[4]The record indicates that the trial court gave defendant credit for 187 days spent in presentence custody.

life prisoners for good behavior and participation (Cal. Admin. Code, tit. 15, div. 2, ch. 3, § 2290). Thus, the question is identical to the question of whether a person sentenced to a definite term is entitled to work time/good time credit under Penal Code section 4019, presently pending before the state Supreme Court in *People* v. *Brown,* ■ (Cal.App.), and related cases. The matter is, therefore, remanded for a determination of the good time/work time credits that here can be applied only after the MEPD. In all other respects, the judgment is affirmed.

Rouse, J., and Miller, J., concurred.

The petitions of both parties for a hearing by the Supreme Court were denied February 7, 1980.