[Crim. No. 1785.   Third Dist.   Mar. 19, 1942.]

THE   PEOPLE,   Respondent,   v.   WILLIAM   COLEMAN,
Appellant.

O. F. Meldon for Appellant.

Earl Warren, Attorney General, and J. Q. Brown, Deputy Attorney General, for Respondent.

STEEL, J. pro tem.—The defendant here was charged by information with the murder of Cretie Coleman from whom he had secured an interlocutory decree of divorce. He entered a plea of not guilty and not guilty by reason of insanity. After a trial by jury upon the pleas so entered he was found guilty of murder in the first degree, with recommendation of imprisonment for life, and on the trial of the second plea was found sane at the time of the commission of the offense. Judgment was thereafter pronounced, and a motion for a new trial was denied. This appeal followed.

The crime was alleged to have been committed in July, 1937, and at the time set for trial in October, 1937, the question of the then present sanity of the defendant arose, and after a hearing thereon it was determined that he was then insane, whereupon the trial was continued until such time as the defendant shall have been restored to sanity. He was committed to the State Hospital for the Insane at Stockton, and in 1941 he was declared sane. Thereupon the instant trial proceeded, resulting in his conviction.

The facts of the case as shown by the evidence are substantially as follows: The defendant had been engaged in the linen supply business in Sacramento, and the decedent, after their divorce, was working for one Samuel Cassinelli, who was engaged in the business of repairing typewriters and furnishing office supplies in Sacramento. In the evening of July 20, 1937, after closing the shop, Mrs. Coleman and Cassinelli drove out to William Land Park in the city, to have a picnic lunch. After parking their car they walked over some forty feet and sat down on the lawn, and as they started to partake of their food Cassinelli saw defendant approaching them, and asked the defendant "what is the idea of following people

around" to which the defendant responded, "I will show you, you little trouble maker," and at that the defendant pulled out his gun and started shooting. Cassinelli ran through the shrubbery to his car to obtain a policeman's club which he had, while Mrs. Coleman, pursued by the defendant, ran in another direction to where a Mr. and Mrs. Stam were also having a picnic. When Cassinelli returned from his car with the club, he testified, "the next thing I saw, when I come back, before I got to the spot where Mr. and Mrs. Coleman were, Mr. Coleman was standing over Mrs. Coleman hitting her over the head with the pistol he had in his hand,—she was crumpled to the ground which was right next to an automobile."

Mrs. Stam testified in part as follows:

"Q. What did you do after you heard the gun shots? A. Well, just in a few minutes she ran around. Q. Who? A. Mrs. Coleman, ran around and she hung on to my shoulder, so he ran around after her,—— Q. (Interposing) Who did? A. Mr. Coleman. Q. The defendant? A. And, told me to get out of the way, so I dropped to the ground, and crawled,—I crawled a few feet into the road, then she went over and hung on to our car." . . . Q. Now you saw Mrs. Coleman then go to your car, and what did she do when she got to your car, if you noticed? A. She just hung on to the door; the car door was open, and she hung on to the car. . . . Q. And slumped down,—what happened after that, if anything, that you saw? A. The next I heard, she said, 'Oh, someone help me.' Q. Was Coleman there then? A. Yes; he wouldn't allow any one to help her. Q. What did he do? A. He was swinging the gun, and he told everyone to move, get away from her."

This testimony was corroborated by her husband, Mr. Stam, who testified as follows:

"Q. What happened after you saw them? A. The lady came to my wife and she clinched my wife, then my wife shaken her off,—— Q. Your wife did what? A. My wife shakened her off,—she wants to get away, she doesn't want to have anything to do with it. Q. Then what happened? A. Then she run to the car, to the door of the car, then she hung on to the door of the car, then this person was right back of her with the gun and he emptied the gun in her body. Q. How many shots? A. Oh, maybe two or three, I don't know; and one went through the windshield, and then his gun clicked, then he hit her over the head with the gun. Q. Do

you know which end of the gun he hit her with? A. He turned it around, hit her with the butt. Q. Then what happened to the lady? A. What lady? Q. That he shot? A. She let go and she went up to the tree and she was hanging on there, then went down. Q. And the man who did that shooting, Mr. Stam, you identify as this defendant, Coleman, is that right? A. Yes, sir.''

Two other witnesses who were driving by testified as to seeing the defendant waving his gun and warning them to stay away.

An autopsy surgeon testified that decedent died from hemorrhages; that she had two bullet wounds in her back and a laceration on her scalp, and also on her upper lip, which is also shown by photographs admitted as exhibits in evidence.

The defendant testified that he had had trouble with his wife over the matter of payment to her of alimony and that she had been urged to keep after him by Cassinelli; that he went out to the park by prearrangement, to have a talk with her about the question of alimony, and that as he approached them, Cassinelli called him a foul name and reached for his pocket, whereupon defendant started shooting, his wife running between the two of them, and the bullets hit her unintentionally.

The defendant, appellant herein, first contends that the evidence is insufficient to support a verdict of murder in the first degree in that there was no evidence of premeditation or deliberation upon the part of the appellant to take his wife's life, but at best it would justify a verdict of manslaughter only. We find no merit in this contention. The evidence discloses that appellant went to the park armed with a loaded revolver; that he carried it in the front compartment of his automobile, and that when he got out of his car he removed the gun and took it with him. What happened thereafter was entirely for the jury to determine, and we find no evidence which would warrant the conclusion that the crime was committed in the heat of passion or upon sudden impulse. There were no threats made against appellant, nor did he see any gun or weapon in the hands of his wife or Cassinelli. When Cassinelli ran to his car, appellant chased the deceased and fired two or three shots into her body and then struck her upon the head with the butt of his revolver. This, of course, could not have been accidental but rather appears to have been deliberately planned.

■ The act of killing may follow the intent to kill as quickly as follow the successive thoughts of the mind. (*People* v. *French,* 12 Cal. (2d) 720 [87 Pac. (2d) 1014] ; *People* v. *Blackwood,* 35 Cal. App. (2d) 728 [96 Pac. (2d) 982] ; *People* v. *Aranda,* 12 Cal. (2d) 307 [83 Pac. (2d) 928].)

■ Appellant next complains of the ruling of the trial court in sustaining an objection by the prosecution to a question propounded to the mother of appellant as to where appellant had lived all his life, save during his married life. It is argued that the information sought was relevant as bearing upon the character and disposition of the appellant as well as his physical and mental condition. While the subject matter may have had some bearing upon the issue of insanity and proper to be brought out upon the later trial, it obviously was immaterial to the main issue then before the court and jury.

Complaint is made of the giving and refusal to give of certain requested instructions, but no argument is made and no authorities are cited in support of the objections so made to many of such questioned instructions, therefore we will consider only such as have been attacked by argument or authority.

■ The court instructed the jury fully upon the subject of murder in all its degrees as well as manslaughter, and upon the subject of ''malice aforethought,'' to which instruction our attention is directed by appellant. The instruction given is as follows:

''Malice aforethought, either express or implied, is manifested by the doing of an unlawful and felonious act intentionally, deliberately and without legal cause or excuse. It does not imply a pre-existing hatred or enmity towards the individual injured.''

It is the last portion to which exception is taken. It is argued that there was no evidence of hatred or enmity toward the decedent and therefore its absence should be considered as a circumstance negativing the existence of this necessary element of ''malice aforethought.''

The given instruction is a correct statement of the law and is invariably given in all homicide cases. (*People* v. *Fallon,* 149 Cal. 287 [86 Pac. 689] ; *People* v. *Balkwell,* 143 Cal. 259 [76 Pac. 1017].)

We have examined the record and find the instructions given to be adequately full and complete.

■ Certain photographs of the decedent were received in

evidence to which complaint is made as prejudicial error. While it is true that the introduction of such evidence in cases where it is unnecessary should be disapproved (*People* v. *Burkhart,* 211 Cal. 726 [297 Pac. 11]), however, in the instant case the photographs were competent to show the head injuries inflicted by the butt of the pistol and which appellant denied, and also as corroborating the doctor's testimony showing definitely the two bullet holes fired from close range.

There is nothing about the pictures which is shocking, obscene or inflammatory, and no prejudice resulted to the defendant in that regard. (*People* v. *Magsaysay,* 210 Cal. 301 [291 Pac. 582] ; *People* v. *Sisson,* 1 Cal. (2d) 510 [36 Pac. (2d) 116] ; *People* v. *French, supra.*

The appellant finally contends that since there was a period of some four years which had elapsed from the date the offense was committed until the trial thereof, during which period appellant was an inmate of the State Hospital, a presumption, or at least a strong inference arises that he was insane at the time of the commission of the crime. However that may be, it appears that the same jury which tried the main issue of not guilty was retained to try the issue of insanity, and in their deliberations they no doubt gave due consideration to all of the evidence which was introduced insofar as it had any bearing upon the question of the sanity or insanity of the appellant at the time the homicide occurred. Several expert witnesses testified on the issue of insanity, and while there is some conflict in the evidence regarding whether appellant knew right from wrong at the time of the homicide, the record nevertheless contains evidence of a substantial character amply sufficient to sustain the jury's verdict. The weight, effect and value of the opinions of the experts were matters for the jury to determine, and they have the right and it was their duty to weigh such evidence in conjunction with all the facts and circumstances in determining whether or not the sanity of the defendant was shown by a preponderance of the evidence.

We find no prejudicial error in the record which would warrant a reversal, and the judgment and order appealed from are therefore affirmed.

Thompson, Acting P. J., and Tuttle, J., concurred.