229 Cal.App.3d 1417 (1990)
3 Cal. Rptr. 747
THE PEOPLE, Plaintiff and Respondent,
v.
DIANE ROCHELLE BOBO, Defendant and Appellant.
Docket No. C004511.
Court of Appeals of California, Third District.
July 6, 1990.[]
*1421 COUNSEL
Francia M. Welker, under appointment by the Court of Appeal, for Defendant and Appellant.
John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Arnold O. Overoye, Thomas Y. Shigemoto *1422 and Harry J. Colombo, Deputy Attorneys General, for Plaintiff and Respondent.
[Opinion certified for partial publication.[]]
OPINION
EVANS, J.
In the published portion of the opinion, we address the impact of the 1981 changes to the Penal Code, sections 28, 29, 188, and 189, that abolished the defense of diminished capacity and refined the concepts of "express malice" and "deliberate and premeditated."
The unpublished portion of the opinion illustrates the distinction between the medical diagnosis of a serious mental disease and the legal definition of insanity.
A jury found defendant guilty of arson and three counts of first degree murder. (Pen. Code, §§ 451, subd. (b), 187; all further undesignated section references are to the Penal Code.) The jury found the alleged special circumstance of multiple murders to be true (§ 190.2, subd. (a)(3)) and that defendant used a deadly weapon (a knife) to commit the killings (§ 12022, subd. (b)). This same jury found defendant sane during the commission of the crimes.
The prosecution did not seek the death penalty. Sentenced to three consecutive life terms without the possibility of parole, defendant appeals asserting (1) the evidence is insufficient to support the convictions and sanity findings, (2) the prosecutor committed misconduct, and (3) the trial court erred (a) in refusing to give voluntary manslaughter instructions, an instruction distinguishing guilty and innocent motive, a particular insanity instruction, and an instruction on uncontradicted expert testimony; and (b) in denying defendant's motions for exclusion of extrajudicial statements and certain prejudicial evidence, for new trials, and for a different jury at the sanity phase. We affirm.
The nature of the crimes, jury findings, and contentions made on appeal requires an extensive recitation of pertinent facts. We first examine the guilt phase of the trial.

FACTS
Shortly before noon on April 5, 1987, the Sacramento Fire Department responded to a fire at defendant's apartment located within a public housing complex. Firefighter Robert Johnson entered the burning premises and *1423 found defendant's three children  Dianeka H. (eight months), Tashima T. (four years), and Jacoby T. (six years)  on a bed in the upstairs bedroom. All three had been stabbed. There were no vital signs on the two youngest and medical intervention failed to resuscitate the third. A butcher knife was found on the bed and bloody water was found in the upstairs bathtub.
A resident of the complex, Susan Brown, saw defendant in flames run out the back door of her apartment. While another resident doused the flames, Brown heard defendant say, "[H]e made me kill 'em. They made me" and "[T]hey killed my family."
After Firefighter Johnson removed the children, fire apparatus operator Paul Steinkamp was directed to defendant by the crowd which had gathered. When defendant indicated she was the mother, Steinkamp asked her what happened. She told him she had stabbed her kids and set her apartment on fire. Steinkamp thought defendant also said, "`He made me do it.'"
According to Johnson, while defendant was being attended to by ambulance personnel, she rocked ceaselessly and repeated words like "`I wish I were dead'" or "`I want to be dead'" to no one in particular.
The fire was determined to have been intentionally set; splash and burn patterns on the downstairs couch indicated the use of a flammable liquid. An empty can of charcoal lighter fluid was found in an upstairs bedroom on top of a bassinet. The structural area behind the couch had been burned.
Defendant was taken to the hospital for treatment of deep second and third degree burns on her feet, thigh, and buttocks. About six hours later, she waved for (guard) Deputy Sheriff Richard Bankie to enter her room. Bankie entered and with defendant looking straight at him, she said, "`Can you take me to the morgue. I want them to cut me up like I did those babies. It's my turn to die now.'" After Bankie explained she was in custody, she said, "`I don't deserve to live. I cut those babies up and then set my place on fire. I cut my own babies up. I want to be cut up too.'"
About an hour after defendant made her statements to Deputy Sheriff Bankie, she was interviewed at the hospital by Detective Frank Fermer. The interview was tape-recorded and transcribed.
*1424 After defendant stated her name, age, date of birth, address, and the fact she had no phone, Fermer "Mirandized" her.[1] Defendant answered "yes" when asked whether she understood her Miranda rights and whether, having those rights in mind, she wished to talk.
When Detective Fermer asked defendant "what happened out there," she provided the following incoherent response, "Those, like, uh, those, like the whole projects harassing me, and I had went to jail for assault and battery, and one was like this porno movie (inaudible) Chinese guy in Zerdo (inaudible).... [¶] Newport running a porno movie at  ... Captain. [T]hen I got caught up in the black mafia gang, um, the Midnight Star, and they was harassing me around the playground and he said that they would kill me, they would kill my kids and burn us in the front yard, if, um, I didn't kill them, ... [¶] Take an extinguisher and singe and burn my kids. (sobs) I killed my kids so they wouldn't kill them and kill me then.... [¶] So they wouldn't kill my kids and me, and then I jumped off the house, and I jumped into the fire to burn myself up, and then the dude came on me with the extinguisher trying to burn me up and his name was JOE JOHNSON.... [¶] [H]e was at the prison.... [¶] Lerdo [which is] in Bakersfield and Midnight Star the singing group.... [¶] ... they killed my family, RENE CARTHEN, KIM CARTHEN, and burnt them in some body bag."
Defendant then said she and the kids got up about 7 a.m. on the day of the killings; she told Fermer the children's names and where they slept.
She then stated that Midnight Star and Joe Johnson came to her house the night before the killings and put "some ... kind of drug" into her hands. All of the people in the complex knew about it and they were harassing her. Her family was going along with it because they were making a movie. They were trying to kill her because she had witnessed a "drug hit this murder" "at martial, the Chinese book (inaudible) because they was running porno ring." When Detective Fermer asked defendant if she and the children were alone in the house at the time of the killings, she replied that "[n]o one else was in the house because they said they was going to come back and kill me and my kids and I had went to the store and bought myself some ether because they were coming to kill us."
Asked to tell about the killings, defendant stated she killed the children "one by one" with a butcher knife "because they said they was going to ... come back  okay, they killed my family, shot them up in the street. Said they were going to burn their bodies.... Come join them because we're *1425 going to kill you and your kids later anyway." She then described the order in which the children were killed. Although her children asked her not to kill them, she told them "that they was going to have a worser death." After being stabbed, the children were still alive so she "drowned them in the bathtub." She then laid the children on her bed and started the apartment on fire by placing a living room couch pillow on the stove, starting the kitchen on fire, and throwing the lighted pillow back onto the couch.
After starting the fire, defendant got on the bed with her children. She then "yelled out the window to tell the people next door to get out of the house because I started my house on fire and everybody started running." To confirm this point, Detective Fermer inquired, "So, you yelled this out the window?" Defendant replied, "Out [the] upstairs window at my kids and everybody in the apartment was with the people that were trying to kill me and then, like I went back off and up inhaling the smoke, but it was taking too long to kill me. I wanted to die with them, ..." Defendant continued to relate a variety of delusional predicates for the methodical killing of her children and torching of her apartment.
Defendant stated she had lived at her apartment for 15 months, that Dianeka's father was Clarence Haynes, a 28-year-old Black male employed by Creative Landscaping. The father of her other two children was Tim Tate, who had attended Hiram Johnson and McClatchy High Schools, graduating in 1979. Defendant graduated from McClatchy in 1980. Defendant added that she killed Tim Tate "two days ago ... in my front yard.... Midnight Star took his body away."
Defendant said she just started killing the kids "because they said they were going to kill them." She reiterated the order of killing, the manner of killing, and how she started the fire.
Defendant told Fermer her father was Alan Bobo and she gave a phone number for him as well as a phone number for her sister Kim Carthen. She also provided the name of her welfare social worker. She then added that Joe Johnson, Midnight Star, and Judge Wapner killed her father "[t]his morning or either last night because there's a whole bunch of them. They were trying to talk him out of not killing me."
Joe Johnson had said he was going to kill her and rape and molest her children in front of everyone and burn them to the bone "`just like we burnt your family.'"
When Detective Fermer asked defendant what she did with the butcher knife, she replied, "I had it in my hand and then Midnight Star with black *1426 mafia and then talking about, we're gonna burn you with the extinguisher (very rushed, frantic).... [¶] ... I couldn't even speak and they were drugging me. They were raping my kids. They got the [preschool] teacher doing it.... [¶] They killed my whole family. They killed my grandmother, my uncle."
Defendant told the detective that she killed her kids "about one or twelve because that's when they said they were coming back." Asked if "they" were, "Joe Johnson and the Midnight Star," she said, "Yes." Midnight Star works at Pak 'N Save; "[t]heir daddy owns the store."
Contrary to defendant's account, her family and Tim Tate had not been killed; moreover, her references to Judge Wapner and the Midnight Star were demonstrated to be totally delusional.
Autopsies were performed on defendant's three children on April 6, 1987. Each appeared well nourished and well developed. Dianeka had eight stab wounds to her chest and abdomen with seven superficial cuts. The superficial cuts were described by forensic pathologist Robert Anthony, M.D., as "hesitation" cuts, that is, indicating a degree of hesitation on the attacker's part when the attacker realizes that a good deal of force is required to achieve penetration. Dianeka was partially eviscerated. There was but a single stab wound to Tashima's heart, and four stab wounds to Jacoby, as well as a couple of "defensive wound" cuts on his finger and wrist.
Defendant's sisters Renee and Kimberly as well as her father Alan Bobo all testified she was a loving mother but described delusional incidents and unfounded paranoid ramblings on her part (consistent with her statements to Detective Fermer) that began in January or February 1987. Neither Renee nor Kimberly thought defendant had a mental problem. Alan was not sure.
Defendant's neighbor and friend Constance Smith described several instances when defendant indicated a desire to kill her children. Another neighbor, Ann Carter, described a similar instance, adding that defendant also stated she wanted to kill herself. Neither took the statements seriously. Smith also described numerous paranoid ramblings from defendant, and both Smith and Carter noted defendant seemed depressed because of overwhelming responsibilities. Carter, however, did not think defendant had a mental problem requiring outside help.
After the killing and fire, defendant was treated at University of California Davis Medical Center for deep second degree burns which necessitated grafting. Janet Lambertsen was the emergency room nurse on duty when *1427 defendant was first brought in. Defendant had a "flat affect." But defendant more than once told Lambertsen that she killed her children before the group Midnight Star could kill them; defendant also stated she started the fire because she killed the kids.
Ruby Chandler-Smith was the clinical social worker on duty in the emergency room on April 5. She noted that defendant was oriented to person, place, and time. When Chandler-Smith asked what happened, defendant replied, "I killed my children," and "`These people put something in my cigarettes. And, they poured embalming fluid down my throat and my kids' throat. Then they said that the kids would have to die and I would have to die too. [¶] They told me I had to kill my kids. So, I killed my kids. They told me I had to kill myself, too.'" When asked about calling her family, defendant responded, "`Those people killed all my family, too. My family is not there. I guess they're dead. Those people killed them, too.'" After providing the phone number of her sister, defendant apparently responded to an internal stimuli, grabbed Chandler-Smith's paper and said, "`They told me to take and keep this paper.'"
Dr. William Green, a board certified psychiatrist on the University of California Davis Medical Center staff, examined defendant about 24 hours after the incident because defendant's treating physicians suspected a psychiatric disorder.
Defendant reported hearing voices and receiving special messages from her television set about the Midnight Star, Judge Wapner, and Joe Johnson; the three of them were threatening to sexually abuse her and her children and then kill the children. Also involved in this conspiracy were the President and the Governor, the latter having laced four of her cigarettes by injecting them. Defendant explained that two or three days before April 6, she had become increasingly fearful and paranoid because of these threats.
During the guilt phase of trial, Dr. Green characterized defendant's delusions as "gross[ly] bizarre," "very complex" and "systematized." From the history provided by defendant, Dr. Green concluded that these thoughts had begun approximately three years before, with some remission, and recurred about thirteen months prior to the acute episode on April 5. According to Green, people with such delusions are often reluctant to disclose them to others, because the paranoia aspect produces not only fear of others but fear of being labeled crazy.
Dr. Green was also of the opinion that defendant was in a delusional state on April 5, which impaired her judgment; he diagnosed her condition as paranoid schizophrenia, acute exasperation. According to Green, defendant *1428 experienced auditory hallucinations on the fateful day and acted on the basis of an intense fear about what outsiders were going to do to her children. Green's initial diagnosis was confirmed through his eight or nine subsequent visits with defendant.
In arriving at his opinions, Green basically relied on defendant's characterization of the events preceding his April 6 examination. He did not have collateral reports but would have been surprised had close family members not noticed some changes in her functional behavior or failed to report some unusual thoughts or statements. He added that it is common for family members to not view such unusual behavior or statements as a mental disorder.
Green could not accept the prosecution's theory that defendant was depressed and suicidal on April 5, that she loved her children and did not want to leave them to an unknown fate, so she carefully decided to kill them before committing suicide, and, bungling the suicide, she then went mad. Green did not think defendant had the intellectual capacity and knowledge to invent particular delusions to deliberately confuse him in diagnosing her. Nor did he think she was sophisticated enough to report such delusions as an excuse for her behavior. Furthermore, a major depression with this degree of psychosis is uncommon. Nor did Green believe that such a complex and advanced delusional system would manifest itself so quickly  that is, she did not suddenly go mad after the killings. Green acknowledged that at the time of his April 6 examination, the most important fact with which defendant was attempting to deal was that she had killed her children.
Dr. Green did not prescribe antipsychotic medication for defendant until April 13, when her medical care was being adversely affected because she had started incorporating hospital personnel and patients into her delusional system.
Also for the guilt phase of the trial, Dr. Paul Mattiuzzi, a psychologist, was appointed by the court to evaluate defendant's present mental state and her mental state at the time of the killings. (§§ 1026, 1027.) Dr. Mattiuzzi examined defendant on September 24, 1987, for some four hours. Defendant was somewhat apprehensive about being examined, preferring instead to return to her dreams. Mattiuzzi administered three psychological tests, including a mental status exam. He also reviewed defendant's postincident medical records, her audiotaped statement to Detective Fermer (on which he placed great reliance), police and investigative reports, defendant's preliminary hearing transcript, and statements from Alan Bobo, Kimberly Carthen, Renee Carthen, Constance Smith, Carolyn Farrar (Tashima's preschool teacher), and personnel from the Florin Road Pak 'N Save Store.
*1429 Dr. Mattiuzzi was of the opinion that defendant was suffering from paranoid schizophrenia, early adult onset. He further stated it was "highly likely" defendant suffered from the same disorder and was delusional when she killed her children. He was "quite certain" of his opinion as to defendant's mental disorder at the time of the offenses, but less so of his conclusion regarding the disorder's duration of less than two years.
Dr. Mattiuzzi described schizophrenia as a thought disorder involving abnormal thought content (e.g., delusions) and the breakdown of the association process (e.g., not understanding that a chair is more like a couch than an automobile) and the perception process (e.g., visual or auditory hallucinations). He noted the other aspects of the disease, including disorder of affect (e.g., flat affect or inappropriate affect), disturbed sense of self (e.g., belief that others control you), disturbances in volition (e.g., poor impulse control), and disturbed psychomotor control (e.g., extreme withdrawal). Genetic factors, biochemical elements, and developmental experiences play roles in the development of the disease.
Mattiuzzi then went on to explain that defendant's case presented a "classic" example of paranoid schizophrenia. According to Mattiuzzi, defendant thought it necessary to kill her children on April 5 to protect them from a variety of people and conspirators who were going to do unspeakable acts to them and to her. By the September 24 examination, Clarence Haynes, defendant's boyfriend, had started to appear in defendant's delusional scheme  he had actually killed the children while she stabbed dolls; Haynes did not want the children.
Dr. Mattiuzzi completely disagreed with the prosecutor's suggestion that defendant "developed [her] delusion in order to delude herself into thinking it was all right to kill her children." And he disagreed with the prosecutor's suggestion that defendant was suffering a reactive psychosis consequential to murdering her children. Defendant's delusional system was too elaborate  it was not the type which developed quickly in response to an act or event. Furthermore, a reactive psychosis would not last as long as defendant's sufferings. He also noted there was no evidence of a major mood disorder. Mattiuzzi acknowledged he had not studied infanticide, although this was such a case.
Dr. Mattiuzzi was aware that certain relatives and friends of defendant's had stated they did not think she had a mental problem prior to the killings. But Mattiuzzi noted that these same people had responded as if being asked for a diagnosis; and they had observed odd behavior and heard strange utterances from defendant, some of which were delusional in nature.
*1430 Defendant's motion for a different jury for the insanity phase of trial was denied, and it was stipulated that the jurors could consider the guilt phase evidence during the insanity phase.
Dr. Mattiuzzi, the psychologist, along with three psychiatrists  Alfred French, Nicholas Cornes, and Fred Rosenthal  testified at the insanity phase.
Dr. Mattiuzzi concluded it was "highly unlikely" that defendant's perception of reality was accurate on April 5, 1987. While defendant may have known "in a most basic sort of way" that stabbing her children and placing them in the bathtub would result in their deaths (i.e., defendant had the capacity to know of the physical act), Mattiuzzi did not believe defendant could understand the significance of those acts. Mattiuzzi was also of the opinion that defendant lacked the capacity to consider what she was doing and how it related to the rights of her children; defendant's paranoid schizophrenia precluded her from understanding the nature and quality of her acts or understanding the acts were wrong.
Reiterating his guilt phase testimony, Dr. Mattiuzzi discounted the theory that defendant's psychosis was simply a way of dealing with the killings. He also opined that certain elements of her delusional scheme remained constant while others varied because she was actively psychotic, in spite of medication, and continued to exhibit a disturbed thinking process.
Dr. Mattiuzzi explained it was common for people to suffer from paranoid schizophrenia without others being aware of it. The very nature of the disease keeps its victim guarded and secretive. Similarly, family members often do not appreciate the significance of the strange behavior they have observed on occasion. Mattiuzzi explained that the statements of defendant's family members and friends were suggestive of the prodromal phase of the illness  the phase of deterioration.
While defendant's statement to Deputy Sheriff Bankie that she did not deserve to live could fairly be said to reflect an ability to distinguish right from wrong, Mattiuzzi explained that such a distinction presupposes a consideration of consequences that defendant's irrational thought process precluded her from making at the time of the killings.
Mattiuzzi acknowledged that the ultimate issue of legal sanity was not one for psychiatrists or psychologists, but that such professionals could help the fact finder understand whether or not someone was or is mentally ill.
Dr. French, an expert in forensic psychiatry, interviewed defendant on five occasions in 1987  April 9, 14, 15, 16, and August 6. The first four *1431 interviews disclosed a woman (defendant) "almost uniquely disturbed among people who I've interviewed and it would be virtually impossible to have an illness of that severity crop up within a matter of hours or a matter of days." During the initial interviews, defendant was so disturbed it was essentially impossible to conduct an ordinary structured examination.
In arriving at his opinions, Dr. French relied on his interviews as well as defendant's postincident medical records, the coroner's investigation, statements from Clarence Haynes, Ann Carter, Thomas Brown, Susan Brown, Paul Steinkamp, and a witness who had observed the fire, and defendant's preliminary hearing transcript.
His opinion was that defendant suffered from paranoid schizophrenia, which he described in a manner similar to Dr. Mattiuzzi's description in the guilt phase. Dr. French did not "have any problem" concluding that defendant was delusional when she killed her children.
Dr. French described defendant's behavior as an "extraordinary massive storm of craziness" and that she was in a frenzy of fear in the context of her delusion. Being so overwhelmed by fear, she was unable to distinguish right and wrong. Beyond knowing that certain acts would kill her children (i.e., the stabbings), defendant could not know much else; she had no idea as to the quality of her acts.
French disagreed with the prosecutor's theory that defendant first decided to commit suicide and secondarily decided to kill her children, noting that his conclusion of overwhelming fear provided a more sensible explanation.
At a hearing on February 4, 1988, as to whether defendant gave informed consent to be interrogated by Detective Fermer on April 5, 1987, Dr. French testified he doubted defendant had such capacity but without asking certain questions there was no way to tell the effect of her delusion at that moment. At trial, French noted that this testimony concerned solely the issue of informed consent at a particular time, a different issue than those at trial.
Dr. French also admitted there was no psychosis indicated from the tests he had administered, and admitted penning the statement that, based on his interviews with defendant, "one either does or does not accept her report of a delusional system." But French administered his tests on August 6 when defendant was on medication. And the statement about accepting defendant's report was limited to the information derived from her interviews; Dr. *1432 French noted there was a lot of information aside from defendant's interviews supporting the conclusion that she had a delusion.
Dr. Cornes evaluated defendant in September 1987 under court appointment. (§ 1027.) His diagnosis: chronic paranoid schizophrenia somewhat controlled by medication at the time of his interview. He also concluded that defendant was suffering from an acute exasperation of that condition on April 5 and felt compelled to comply with visual and auditory hallucinations which were command in type. On that date, according to Dr. Cornes, the logical and coherent nature of defendant's thinking was disturbed. As a result, defendant's ability to perceive reality and predict the consequences of her acts was clearly reduced.
The primary basis for Dr. Cornes's opinion was his clinical interview of defendant. Defendant told Dr. Cornes her mental problems began when she broke up with Haynes in January 1987. Defendant told Dr. Cornes Midnight Star killed her children; later, she said a Chinese man killed them; still later, she said she killed them.
Dr. Rosenthal evaluated defendant on six occasions: April 18, May 15, July 2 and 24, and September 17, 1987, and January 25, 1988. His diagnosis: paranoid schizophrenia. Dr. Rosenthal had treated and seen "hundreds and hundreds" of schizophrenics in his medical career and found defendant's history consistent with how the disease develops. According to Rosenthal, paranoid schizophrenia's development is insidious, and it is common for friends and relatives not to realize the existence of the disease.
Dr. Rosenthal's opinion was that at the time of the incident, defendant was "acutely psychotic"; she was hallucinating, delusional, and operating in a completely irrational state of mind and could not control her behavior. While defendant may have known that by stabbing her children, she would kill them, she could not know or understand the nature and quality of her actions, nor was she able to distinguish right from wrong at that time. Instead, she perceived extreme danger to her children from people that were in her house. According to Dr. Rosenthal, a psychosis is similar to dreaming in which the nature of one's actions is not appreciated.
Dr. Rosenthal rejected the prosecutor's theory that defendant was depressed and suicidal and decided to kill herself and her children. Dr. Rosenthal testified that from his clinical experience, a psychotic state would be required for the decision to kill the children  such a decision is not consistent with mere suicidal depression. Furthermore, the way the children were killed is inconsistent with a mere depression or mood disorder but consistent with a much more severe loss of touch with reality. After so testifying, *1433 Dr. Rosenthal added, "But, I don't find that I would not be able to explain this episode in the way that you are proposing."
After receiving his M.D. degree, Dr. Rosenthal worked for a number of years as a research physiologist in neurophysiology, studying the physiological functioning of the brain. He explained that schizophrenia develops because of a chemical imbalance in the brain. This imbalance can be treated with a powerful antipsychotic drug called Prolixin. A person who does not suffer from that chemical imbalance cannot tolerate the severe side effects of Prolixin. Dr. Rosenthal's opinion that defendant was psychotic when she killed her children was further supported when he noted that defendant's psychotic symptoms varied inversely with the dosage of Prolixin given her. Coupling these scientific facts with "all the history," Rosenthal proceeded to his diagnosis, although he admitted he was "not saying that I know for a certainty that's what happened."
The defense then called Detective Fermer to reiterate statements Constance Smith, Renee Carthen, and Alan Bobo had made to him substantively consistent with their trial testimony. Fermer further testified that Clarence Haynes told him the last time he saw defendant was the Wednesday before the children were killed, and everything was "fine" at that time. Haynes also informed Fermer that defendant on occasion would simply drift out of a conversation; "[s]he even would go away from him" as if going into her own shell.
The prosecution presented no evidence at the insanity phase.

I
(1a) Defendant claims there is insufficient evidence that she harbored malice or that the killings were premeditated and deliberate. We disagree.
(2) In reviewing these claims, we must consider the entire record in the light most favorable to the judgment to determine whether any rational trier of fact could have found, beyond a reasonable doubt, the disputed elements. (People v. Guerra (1985) 40 Cal.3d 377, 385 [220 Cal. Rptr. 374, 708 P.2d 1252]; People v. Johnson (1980) 26 Cal.3d 557, 576-577 [162 Cal. Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)
(1b) Express malice requires simply an intent unlawfully to kill. (People v. Stress (1988) 205 Cal. App.3d 1259, 1268 [252 Cal. Rptr. 913]; § 188; see Discussion II, post.) Express malice can be compatible with a killing that is the result of a bizarre and delusional motive. (Ibid.) In the present case, there is an abundance of evidence that defendant intended to kill her *1434 children and such evidence is not limited to defendant's statements to Detective Fermer. Defendant's actions in stabbing and then immersing her children speak louder than do her ramblings to Fermer. Moreover, defendant's mental illness evidence indicated she killed her children to save them from a perceived worse fate. No legal justification or excuse for the killings was offered. (Stress, supra, at p. 1268.) As we shall see, there is no mitigation theory in the law applicable to the evidence here. (See Discussion II, post.) Thus, there was sufficient evidence defendant harbored malice. (Stress, supra; § 188.)
(3a) Reduced to its essence, defendant's claim regarding deliberation and premeditation is that her delusional, psychotic system was incompatible with the careful thought and weighing of considerations necessary to find those two elements. We disagree.
In 1981 the Legislature added the following sentence to the statutory definition of first degree murder (§ 189): "To prove the killing was `deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." The 1981 amendment to section 189 was part of the legislative package abolishing the diminished capacity defense. (Stats. 1981, ch. 404, § 7, p. 1593; see Discussion II, post.) "Mature and meaningful reflection was clearly the California Supreme Court's shorthand way of applying the concept of diminished capacity to the elements of deliberation and premeditation [see People v. Wolff (1964) 61 Cal.2d 795, 821 [40 Cal. Rptr. 271, 394 P.2d 959]]." (People v. Stress, supra, 205 Cal. App.3d at p. 1270.)
Based on this amendment to section 189, Stress concluded that "[a] finding of deliberation and premeditation is not negated by evidence a defendant's mental condition was abnormal or his perception of reality delusional unless those conditions resulted in the failure to plan or weigh considerations for and against the proposed course of action. The mental process necessary for a finding of deliberation and premeditation is not dependent on the motivation for the act. [A first degree murderer need not have a rational motive for killing. (People v. Lunafelix (1985) 168 Cal. App.3d 97, 102 [214 Cal. Rptr. 33].)] Nor is the necessary mental process lacking when the considerations reflected on by the defendant were the product of mental disease or defect." (People v. Stress, supra, 205 Cal. App.3d at pp. 1270-1271.)
Even though the defendant in Stress suffered from a paranoid delusional psychosis, the court found sufficient evidence that he committed a deliberate and premeditated killing. Stress was enveloped within a delusional crusade to expose a national conspiracy that ensured professional athletes *1435 escaped military service during the Vietnam War. At his wits' end concerning how to deal with the conspiracy, Stress decided to kill his wife to gain the attention he needed to expose the plot.
Stress instructs that a delusional, psychotic system can be compatible with the premeditation and deliberation required for a first degree murder.
(4) The type of evidence which the California Supreme Court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: "`(1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing  what may be characterized as "planning" activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" (People v. Thomas, supra, 25 Cal.2d 880, at pp. 898, 900, 901 [156 P.2d 7]); (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).'" (People v. Lunafelix, supra, 168 Cal. App.3d at pp. 100-101, quoting People v. Anderson (1968) 70 Cal.2d 15, 26-27 [73 Cal. Rptr. 550, 447 P.2d 942], italics in original.)
(3b) Viewing the entire record before us in the light most favorable to the judgment, we find evidence of all three categories.
As to planning activity, the defendant and her children were awake together for nearly five hours before the killings. There was a can of charcoal lighter fluid found on the baby's bassinet, and defendant told Detective Fermer she had gone to the store and bought some ether. Defendant stabbed and drowned the children to ensure their deaths. While the guilt phase testimony of Dr. Mattiuzzi and Dr. Green indicates that defendant's crimes were the product of a paranoid delusion, there was substantial evidence that defendant, like the defendant in Stress, was purposefully planning and acting in the context of that delusion. The purpose of defendant's plans and actions was to save her children from a perceived worse fate. A *1436 jury could reasonably infer from the evidence that defendant's delusional system did not preclude a planning or a weighing of considerations.
As to motive, defendant had stated on a number of occasions that her children were getting on her nerves, making her sick, and that she felt like killing them. While these statements were apparently hyperbole, defendant had told Ann Carter that she felt like killing herself as well. Additionally, the evidence was extremely strong that defendant harbored an irrational motive  to kill her children to save them from a worse fate.
Finally, the manner in which the children were killed  in sequential order, starting with the youngest  was a particular and exacting one, and their deaths were assured when defendant submerged each of them in water after stabbing them.[2]

II
(5a) Citing People v. Molina (1988) 202 Cal. App.3d 1168 [249 Cal. Rptr. 273], defendant contends the trial court erroneously refused to instruct on voluntary manslaughter. We disagree with the analysis in Molina and determine, on these facts, there was no error.
In Molina, a psychotic mother experiencing auditory hallucinations killed her 18-month-old son by strangling him, stabbing him, and then starting several fires in their residence. The trial court refused the mother's requested instructions on manslaughter and instructed only on first and second degree murder. Paralleling the case before us, the second degree murder theory in Molina was an intentional killing without sufficient evidence of premeditation and deliberation. (202 Cal. App.3d at p. 1172; CALJIC No. 8.30.) Molina was convicted of second degree murder while using a knife and found not guilty by reason of insanity. (202 Cal. App.3d at p. 1170.)
The court in Molina noted that without manslaughter instructions the jurors had no option but to acquit if they determined that, because of her mental illness, defendant did not actually form malice or the intent to kill; a reversal was required because the issue of manslaughter had not been resolved adversely to Molina under the instructions which were given. (202 Cal. App.3d at pp. 1170, 1172-1175; §§ 25, 28, 29.)
The conclusion in Molina resulted from an analysis of sections 25, 28 and 29. (202 Cal. App.3d at pp. 1172-1174.) Section 25 states in pertinent part: *1437 "(a) The defense of diminished capacity is hereby abolished. In a criminal action, ... evidence concerning an accused person's ... mental illness ... shall not be admissible to show or negate capacity to form the particular purpose, intent, motive, malice aforethought, knowledge, or other mental state required for the commission of the crime charged." (Italics added.)
Section 28, subdivision (a), provides in pertinent part that evidence of mental illness "shall not be admitted to show or negate the capacity to form any mental state," but "is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (Italics added.) Subdivision (b) of that section abolishes the defenses of diminished capacity, diminished responsibility, and irresistible impulse as "a matter of public policy...."
Section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."
Based on these sections, Molina concluded: "The apparent meaning of the statutory language is that evidence of mental problems is inadmissible to show that a defendant lacked the capacity to form the requisite mental state, but is admissible to show that the defendant actually lacked the requisite mental state. An expert may testify regarding the defendant's mental condition so long as the expert gives no opinion on the ultimate question of whether or not the defendant actually had the requisite mental state." (Italics in original, 202 Cal. App.3d at p. 1173.) According to Molina, "[t]he inclusion of the language in [section 28] subdivision (a) regarding the actual formation of [premeditation and deliberation, specific intent, or malice] shows that the Legislature did not foreclose the possibility of a reduction from murder to voluntary manslaughter where malice is lacking due to mental illness, or a further reduction to involuntary manslaughter where intent to kill is not present for the same reason." (Id., at p. 1174.)
The analysis in Molina, however, fails to account for an amendment to the definition of express malice aforethought enacted as part of the legislative package adding sections 28 and 29 to the Penal Code.
Sections 28 and 29 were part of the 1981 legislative package (hereafter, 1981 legislation) abolishing the diminished capacity defense. (Stats. 1981, *1438 ch. 404, §§ 1-7, pp. 1591-1593, subsequently amended nonsubstantively for our purposes.)[3] But the 1981 legislation did not stop at abolishing this defense; it also amended sections 188 (defining malice aforethought) and 189 (defining first degree murder) as well as three other sections not pertinent here. (§§ 21, 22, 26.)
Through the pertinent amendments, a second paragraph was added to the original definition of malice in section 188, and a third paragraph was added to section 189.[4] Section 188 now provides: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] When it is shown that the killing resulted from the intentional doing of an act with express or implied malice as defined above, no other mental state need be shown to establish the mental state of malice aforethought. Neither an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of malice."
(6) The second paragraph added to section 188 clearly provides that once the trier of fact finds a deliberate intention unlawfully to kill, no other mental state need be shown to establish express malice aforethought. The question of whether a defendant acted with a wanton disregard for human life or with some antisocial motivation is no longer relevant to the issue of express malice. (People v. Stress, supra, 205 Cal. App.3d at pp. 1267-1268; People v. Rosenkrantz (1988) 198 Cal. App.3d 1187, 1203 [244 Cal. Rptr. 403]; see also People v. Croy (1985) 41 Cal.3d 1, 18-19, fn. 12 [221 Cal. Rptr. 592, 710 P.2d 392].) This conclusion becomes manifest when the last sentence of section 188 is analyzed. That sentence directly repudiates the holding in People v. Conley (1966) 64 Cal.2d 310 [49 Cal. Rptr. 815, 411 P.2d 911], that the statutory definition of both express and implied malice includes an awareness of the obligation to act within the general body of laws regulating society. (Id., at pp. 321-323; People v. Fusselman (1975) 46 Cal. App.3d 289, 299 [120 Cal. Rptr. 282].)
Conley was a diminished capacity case that surveyed several decades of precedent to conclude that malice is characterized by a wanton disregard *1439 for human life or an antisocial motivation. (64 Cal.2d at p. 322; People v. Croy, supra, 41 Cal.3d at p. 18.) According to Conley, "[a]n intentional act that is highly dangerous to human life, done in disregard of the actor's awareness that society requires him to conform his conduct to the law, is done with malice...." (64 Cal.2d at p. 322.) "If because of mental defect, disease, or intoxication, however, the defendant is unable to comprehend his duty to govern his actions in accord with the duty imposed by law, he does not act with malice aforethought and cannot be guilty of murder in the first degree." (Ibid.)
Because of Conley and its progeny  most notably, People v. Poddar (1974) 10 Cal.3d 750, 759-760 [111 Cal. Rptr. 910, 518 P.2d 342], and People v. Fusselman, supra, 46 Cal. App.3d at pages 298-301  the law prior to the 1981 legislation recognized that a person "may deliberate, premeditate and intend to kill his victim, yet not act with malice aforethought so that the maximum offense of which he could be found guilty would be voluntary manslaughter." (46 Cal. App.3d at p. 299.) After the 1981 legislation, express malice and an intent unlawfully to kill are one and the same. (§ 188; People v. Stress, supra, 205 Cal. App.3d at p. 1268; People v. Rosenkrantz, supra, 198 Cal. App.3d at pp. 1202-1203.) On the issue of express and implied malice encompassing a societal obligation component, Conley, Poddar, and Fusselman have been abrogated by the 1981 legislation.[5] However, the mere intent to kill remains distinct from a deliberate and premeditated intent to kill, the latter still required more understanding and comprehension of the character of the act. (People v. Van Ronk (1985) 171 Cal. App.3d 818, 823 [217 Cal. Rptr. 581].) In this way, the distinction between first and second degree murder  in the absence of other statutory circumstances (e.g., murder by poison, torture, etc.  see § 189)  is maintained. (Id., at p. 822.)
But what about the distinction between murder and voluntary manslaughter, both of which require the same specific intent to kill? (People v. Van Ronk, supra, 171 Cal. App.3d at p. 824.) If such an intent equates with express malice, does the offense of voluntary manslaughter continue to exist in California? Initially we note that the statutory definition of voluntary manslaughter survived the passage of both Proposition 8 and the 1981 legislation. According to section 192, voluntary manslaughter is the unlawful killing of a human being without malice upon a sudden quarrel or heat of passion; the requirement of provocation is implicit in the statutory *1440 definition of the crime. (Id., at pp. 823-824, fn. 3.) Moreover, the absence of malice in section 192 is theoretical, not factual. According to one widely quoted commentator, "from a strictly realistic point of view, [section 192, voluntary manslaughter] is likewise malicious; but, according to common law tradition, the malice is presumed to be wanting in [a killing resulting from a sudden quarrel or heat of passion upon sufficient provocation], the act `being rather imputed to the infirmity of human nature.'" (Pike, What Is Second Degree Murder in California? (1936) 9 So.Cal.L.Rev. 112, 113, quoting 1 Mitchie, Homicide (1914) § 21, p. 130 (italics in original); see People v. Holt (1944) 25 Cal.2d 59, 84-85 [153 P.2d 21]; People v. Van Ronk, supra, 171 Cal. App.3d p. 823.) (7a) Consequently, section 188's equation of express malice and intent unlawfully to kill does not abrogate the statutory crime of voluntary manslaughter. Although Conley's judicial formulation of a diminished capacity voluntary manslaughter is no longer tenable, the statutory "sudden quarrel or heat of passion" strand of the offense is still recognized.
Distinct from both diminished capacity and "sudden quarrel or heat of passion" is another type of mitigation that has been recognized in California which can negate malice aforethought and reduce an intentional killing from murder to voluntary manslaughter. That mitigation theory applies when one kills under an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury  the so-called "imperfect self-defense" doctrine. (People v. Flannel (1979) 25 Cal.3d 668, 672, 674-675, 677-680 [160 Cal. Rptr. 84, 603 P.2d 1].) As we shall see, this theory is inapplicable to our facts. We therefore need not decide whether Proposition 8 and the 1981 legislation abrogated the Flannel concept of voluntary manslaughter, and we proceed on the assumption the concept still exists. (Id., at pp. 678-680.)
Another aspect of the subject of murder versus manslaughter concerns the section 188 express malice language "deliberate intention unlawfully." From the time it was enacted in 1872, section 188 has stated that malice is express "when there is manifested a deliberate intention unlawfully" to kill. One might argue that the word "deliberate" has a significance in the distinction between murder and manslaughter. That argument would be mistaken. (8) As noted in In re Thomas C. (1986) 183 Cal. App.3d 786, 796-797 [228 Cal. Rptr. 430]: "In People v. Valentine (1946) 28 Cal.2d 121 [169 P.2d 1], our Supreme Court pointed out that it was `incorrect [to differentiate] manslaughter from murder on the basis of deliberate intent.... Deliberate intent ... is not an essential element of murder, as such. It is an essential element of one class only of first degree murder and is not at all an element of second degree murder.' (Id., at pp. 131-132; [citations].) Indeed, the standard CALJIC instruction (No. 8.11 (1983 rev.)) has been held to be *1441 a correct definition of express malice aforethought, despite the fact that it does not use the word `deliberate' as used in Penal Code section 188, but merely states that `[m]alice is express when there is manifested an intention unlawfully to kill a human being.' (CALJIC No. 8.11.) In short, `deliberate intention,' as stated in Penal Code section 188, merely distinguishes `express' from `implied' malice, whereas premeditation and deliberation is one class of first degree murder." (See also People v. Van Ronk, supra, 171 Cal. App.3d at p. 824.)
Moreover, as defined in cases predating Conley and Conley's foundational pillars  People v. Wells (1949) 33 Cal.2d 330 [202 P.2d 53], and People v. Gorshen (1959) 51 Cal.2d 716 [336 P.2d 492]  the concept of malice aforethought was manifested by the doing of an unlawful and felonious act intentionally and without legal cause or excuse. (People v. Balkwell (1904) 143 Cal. 259, 263 [76 P. 1017]; People v. Fallon (1906) 149 Cal. 287, 289-290 [86 P. 689]; People v. Coleman (1942) 50 Cal. App.2d 592, 596 [123 P.2d 557]; see also People v. Bender (1945) 27 Cal.2d 164, 181 [163 P.2d 8].) The adjective "deliberate" in section 188 consequently implies an intentional act and is essentially redundant to the language defining express malice.
(9) The adverb "unlawfully" in the express malice definition means simply that there is no justification, excuse, or mitigation for the killing recognized by the law. (People v. Stress, supra, 205 Cal. App.3d at p. 1268.)
(7b) Thus, in the wake of the 1981 legislation, voluntary manslaughter encompasses only an intentional killing resulting from a sudden quarrel or heat of passion (with adequate provocation), and perhaps a killing arising from an honest but unreasonable belief in the need to defend.
(5b) Now, how is this narrowed definition of express malice aforethought in section 188 (intent unlawfully to kill) reconciled with the language of section 28, subdivision (a)? The latter section makes evidence of mental illness admissible solely on the issue of whether the accused "actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."
Molina ignored the language of section 188 but did conclude from the language of section 28, subdivision (a), "that the Legislature did not foreclose the possibility of a reduction from murder to voluntary manslaughter where malice is lacking due to mental illness, or a further reduction to involuntary manslaughter where intent to kill is not present for the same reason." (202 Cal. App.3d at p. 1174.) Stress did not mention section 28 but concluded that "[t]he clear words of section 188 provide that once the trier *1442 of fact finds a deliberate intent to unlawfully kill, no other mental state need be shown" to establish express malice. (205 Cal. App.3d at p. 1268.)
We think Stress presents the better approach. The addition of the second paragraph to section 188 makes clear the definition of express malice aforethought. Not only was the Conley-Fusselman engraftment of an awareness of societal obligation excised from that definition, but the statute reiterates that no other mental state need be shown to establish express malice than an intention unlawfully to kill. Once such an intention is proved in the context of an actual killing, the offense can be no less than murder unless the killing resulted from a sudden quarrel or heat of passion upon adequate provocation, or (perhaps) an honest but unreasonable belief in the need to defend. Aside from these two types of mitigation, an intent unlawfully to kill and express malice are the same.
If section 28, subdivision (a), read "intent unlawfully to kill" and "express malice aforethought" in the place of "specific intent" and "malice aforethought," our equation above would be obliterated. But section 28, subdivision (a), is a general statute covering all specific intent crimes. Leeway in the language is needed to ensure such coverage. Moreover, malice aforethought can be either express or implied. Nothing is generalized about the definition of express malice in section 188 and no leeway in the language is needed for that precise definition. Furthermore, evidence of mental disease, disorder, or defect is still admissible on the issue of whether the accused actually formed an intent unlawfully to kill  i.e., whether the accused actually formed express malice.
Because of this admissibility, there are no due process problems with section 188 narrowing the concept of express malice. Two principles are involved in this issue. (10) The first principle is that if a crime requires a particular mental state, the Legislature cannot deny a defendant the opportunity to prove he did not entertain that state. The second principle, however, is that the Legislature can limit the mental elements included in the statutory definitions of crimes and thereby curtail the use of mens rea defenses. (§ 6.) (11) It has been judicially established that the 1981 legislation abolishing the diminished capacity defense and limiting admissible evidence to actual formation of various mental states does not violate the due process right to present a defense. (People v. Jackson (1984) 152 Cal. App.3d 961, 967-970 [199 Cal. Rptr. 848]; People v. Lynn (1984) 159 Cal. App.3d 715, 731-733 [206 Cal. Rptr. 181]; People v. Whitler, supra, 171 Cal. App.3d at pp. 340-341.) In amending section 188 in 1981, the Legislature equated express malice and an intent unlawfully to kill. Since two distinct concepts no longer exist, some narrowing of the mental elements included in the statutory definition of (express-malice) murder has evolved. *1443 But a defendant is still free to show that, because of his mental disease, defect, or disorder, he did not in fact intend unlawfully to kill (i.e., did not in fact have express malice aforethought). (§ 28, subd. (a); People v. Whitler, supra, 171 Cal. App.3d at p. 343 (conc. opn. of Sims, J.).) If a reasonable doubt arises from such a showing, the killing (assuming there is no implied malice) can be no greater than involuntary manslaughter (i.e., an unjustified or unexcused killing lacking both malice and an intent to kill). (See People v. Mosher (1969) 1 Cal.3d 379, 391 [82 Cal. Rptr. 379, 461 P.2d 659].)
(5c) In light of our foregoing analysis, we conclude the trial court did not err in refusing to instruct on voluntary manslaughter. The evidence of defendant's mental disease showed she intended to kill her children to save them from unspeakable acts at the hands of others.[6] No theory applied to mitigate her intent to kill. The theory of "sudden quarrel or heat of passion" was inapplicable because defendant's subjective mental state could not be used to meet the objective element of sufficient provocation. (In re Thomas C., supra, 183 Cal. App.3d at p. 798.) Nor is there any evidence that defendant's children provoked her, and the requisite provocation must be from the victim. (Ibid.; People v. Spurlin (1984) 156 Cal. App.3d 119, 125-126 [202 Cal. Rptr. 663].) The Flannel theory of imperfect self-defense does not logically encompass the victim being killed so as to be saved from imminent death or great bodily injury. And there is no justification or excuse that applies.
The defendant, then, is in the same position as the paranoid psychotic defendant in Stress. While her motive for the killing was bizarre and delusional, she clearly intended to kill without a legal mitigation, justification, or excuse. (Stress, supra, 205 Cal. App.3d at p. 1268.) Voluntary manslaughter instructions were therefore inapplicable.
Stress contains a particularly appropriate passage on which to close this discussion: "[Defendant] would decry this conclusion, believing it fails to properly relate intuitive moral conclusions concerning the culpability of the mentally ill to determinations of criminality. It is undoubtedly true that the demise of the defense of diminished capacity and the narrowing of mental elements will reduce the class of offenders whose criminal acts will be excused or mitigated because of mental disease or defect. However, whether this is wise or will make for a more workable criminal justice system must be left to public rather than judicial debate." (205 Cal. App.3d at p. 1271.)

*1444 III-XIII[*]
.... .... .... .... .... .
The judgment is affirmed.
Puglia, P.J., and Scotland, J., concurred.
NOTES
[] Review granted October 11, 1990. Opinion ordered published December 11, 1991.
[] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III through XIII.
[1] Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]
[2] Our resolution of this issue renders moot a discussion on defendant's contentions that there was insufficient evidence to sustain a finding of multiple-murder special circumstance and a guilty verdict of second degree murder.
[3] Section 25 was adopted by initiative (Prop. 8) at the June 8, 1982, Primary Election. "Although differing viewpoints on the interaction between sections 25, subdivision (a), and 28 exist, i.e., some consider the statutes cover the same subject and others consider them to be complementary, the legislative mandate is clear  the defense of diminished capacity has been abolished. (People v. Spurlin (1984) 156 Cal. App.3d 119, 128 [202 Cal. Rptr. 663].)" (People v. Whitler (1985) 171 Cal. App.3d 337, 341 [214 Cal. Rptr. 610].)
[4] As noted in the preceding section of this opinion, the third paragraph of section 189 abolished the requirement that a defendant must "maturely and meaningfully reflect upon the gravity of his or her act" to be convicted of a premeditated and deliberate killing. (See Discussion I, ante.)
[5] As we shall see, it is unnecessary for us to analyze further the issue of implied malice in the wake of the 1981 legislation. Consequently, we express no other views on the issue. We do note that CALJIC has eliminated the wanton disregard theory from its definition of implied malice, a move approved in People v. Dellinger (1989) 49 Cal.3d 1212, 1215 [264 Cal. Rptr. 841, 783 P.2d 200]. (Cf. CALJIC No. 8.11 (4th ed. 1983 rev. pocket pt.) with CALJIC No. 8.11 (5th ed. 1988).)
[6] Based on this evidence, involuntary manslaughter instructions were inapplicable as well. Such evidence did not negate an intent to kill, but conceded the fact.
[*] See footnote, ante, page 1417.