Filed 5/9/14  P. v. Leon CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>JOSE AUGUSTINE LEON,<br><br>        Defendant and Appellant. | F064119<br><br>(Super. Ct. No. F09904233)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

Richard L. Rubin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Jose Augustine Leon of the first degree murder of Daniel Gonzalez and the attempted murder of Elizando Diaz, Jr. (Diaz). In addition, the jury found true the special circumstance that Leon intentionally murdered Gonzalez while an active member of a criminal street gang and did so to further the activities of the gang.

Leon argues on appeal that two of the jury instructions, CALCRIM Nos. 316 and 337, were erroneous. We disagree. He also argues the trial court erred by failing to instruct the jury that voluntary manslaughter was a lesser included offense to the murder charge. We conclude the facts of this case did not support an instruction on voluntary manslaughter because there was no evidence Leon subjectively acted under a heat of passion.

Finally, Leon attacks one of the fines and one of the assessments imposed by the trial court. First, he argues the trial court should not have imposed a parole revocation fine pursuant to Penal Code section 1202.45[1] because he was sentenced to a term of life without the possibility of parole. We reject this argument because he also was sentenced to a determinate term for the attempted murder conviction, which required the trial court to impose the fine, regardless of the life sentence.

Second, Leon asserts the abstract of judgment should be amended to reflect that the trial court stayed the assessment imposed pursuant to section 1465.8. The People correctly point out the trial court erred in imposing this assessment and the assessment imposed pursuant to Government Code section 70373 because the trial court failed to impose an assessment for each conviction as required by statute. The People also point out the trial court did not have authority to stay the imposition of these assessments. Accordingly, we will vacate these two assessments and remand the matter to the trial court to comply with the statutory requirements.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

2.

## FACTUAL AND PROCEDURAL SUMMARY

### The Information

The information charged Leon with the murder of Gonzalez and with the attempted murder of Diaz. (§§ 187, 664.) The murder count alleged Leon personally discharged a firearm resulting in great bodily injury or death (§ 12022.53, subd. (d)), and he committed the crime for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)). The information also alleged the special circumstance that Leon committed the murder while an active participant in a criminal street gang to further the activities of the gang. (§ 190.2, subd. (a)(22).)

The attempted murder count alleged Leon personally discharged a firearm resulting in great bodily injury or death (12022.53, subd. (d)), personally and intentionally discharged a firearm (*id.,* subd. (c)), and the offense was committed for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)).

### The Testimony

#### *Percipient Witnesses*

Joseph Cavazos was with Gonzalez and Diaz the night of the shooting. He testified that a group of about six young Hispanic males went to a party that evening. The party was dull, so the group left. As the group was walking through town, a car passed them. Cavazos did not see the driver or how many people were in the vehicle. Cavazos thought the vehicle was a dark color (black or blue) and had tinted windows. After passing the group, the vehicle made a U-turn. One of the group commented that the vehicle was returning. Cavazos then heard three to four gunshots. The gunshots came from the area where the vehicle was located, but Cavazos could not tell if the gunshots came from the vehicle.

Diaz testified Leon was known as "Smiley," and Smiley associated with the criminal street gang known as "VOCR" (Varrio Orange Cove Rifa), which also is known in Orange Cove as the Bulldogs. Diaz had seen Smiley driving a purple Chevrolet

3.

Malibu, but did not see that car the night of the shooting. Diaz described being with his friends, going to the party for a short while, and then leaving. As he and his friends were walking, they saw a vehicle parked in the middle of the street. He heard three gunshots and was knocked to the ground. He ran from the vehicle when he was able to do so. He was struck by shotgun pellets in his chest, hands, and head and had to be hospitalized.

Diaz claimed he was untruthful when he testified at the preliminary hearing that he saw Smiley's vehicle on the night of the shooting. He could not tell what kind of car the gunshots were fired from or the color of the car. He claimed he could not recall talking with police officers the night he was shot, although he had a vague recollection they were at the hospital.

Deputy Sheriff Austin Herion interviewed Diaz shortly after Diaz arrived at the local hospital. Diaz did not appear to be under the influence of any drug, and he answered questions appropriately. Diaz told Herion he recognized the vehicle as the one driven by Smiley. Diaz stated he saw Smiley point a shotgun out of the driver's side window and shoot at him.

Deputy Sheriff Tim Rivera interviewed Diaz shortly after he arrived at Community Regional Medical Center in Fresno from the local hospital. Diaz did not appear to be under the influence of drugs and responded to questions in an appropriate manner. Diaz stated he was walking with his girlfriend when a purple Chevrolet Malibu drove up. Diaz recognized the driver as Smiley. As he was running, Diaz was shot.

Diaz was interviewed later that night by the investigating detectives. The interview was played for the jury. In the interview, Diaz stated he was walking down the street with some friends, including the victim, when a purple car drove by. Diaz recognized the vehicle as belonging to Smiley, and he recognized Smiley as he drove by. The vehicle made a U-turn after passing the group, and Diaz suspected trouble. He told everyone to run. Smiley shot as Diaz was running away. Diaz identified the photo of Smiley as the shooter. The photo Diaz identified as Smiley was a photo of Leon.

4.

Portions of Diaz's testimony from the preliminary hearing were read into the record. Diaz admitted knowing Leon as Smiley and admitted seeing the vehicle Smiley normally drove on the night of the shooting. He denied, however, seeing Smiley. As he left the preliminary hearing, district attorney investigator Richard Orozco stopped Diaz and asked him why he did not tell the truth in his testimony. Diaz replied that if he had identified Smiley, he would "develop a snitch jacket that would follow him for the rest of his life."

Miguel Juarez testified he was with the group at which shots were fired. He described the events leading up to the shooting in a similar fashion as the other witnesses. He observed Smiley driving his car near the party shortly before the shooting. He also recognized Smiley's vehicle as the one from which the shots were fired. Although he was not sure who was driving, he thought it was Smiley. Two items in his testimony were significant, however. Juarez identified the passenger as the one who shot from the vehicle. He also provided a motive for the shooting. That night Omar Rodriguez told Juarez he had beaten up a member of another gang earlier that afternoon after the other gang member called him a derogatory term.

Gustavo Chapa admitted he affiliated with the Bulldogs gang, and he had been beaten and robbed on the day of the shooting. He denied informing Leon of the incident, but other witnesses established that after Chapa was beaten, he went to Leon's residence and asked for assistance with his injuries. Chapa and Leon then left the residence in Leon's vehicle. Chapa claimed Sureños had attacked him.

Deputies arriving at the scene located the body of the victim, who did not appear to be breathing. They also located three shell casings from a 20-gauge shotgun. Two days after the shooting, an abandoned and burnt 1999 Chevrolet Malibu registered to Leon's mother, Petra Garcia, was recovered just west of Highway 99 in Fresno.

Sometime after the shooting, the apartment in which Leon had lived was cleaned for new renters. Two yellow shotgun shells were located inside the apartment.

5.

Criminalist Robert Benavides testified the shotgun shells recovered from the apartment had been altered to add multiple sizes of shot instead of a single size. The shotgun shells used in the shooting appeared to be modified in the same manner. The shot recovered from the victim also included different sizes of shot. The sizes of shot recovered from the victim and in the shell found at the residence were similar in size.

### Leon's Family

Leon's mother, sister, and wife were called as witnesses for the prosecution. While Leon's wife, Ludivinia Leon,[2] gave the appearance of testifying truthfully, Leon's mother, Garcia, and sister, Guadalupe Villagomez, appeared to testify at trial in a manner they felt would benefit Leon. Garcia and Villagomez were impeached with recorded statements they previously had given to the police.

Garcia testified she did not know if Leon was a member of the Bulldogs criminal street gang. She admitted one of her daughter's called her on the night of the shooting and told her she needed to leave the house. She also admitted on occasion Leon drove the vehicle used in the shooting. She denied seeing Chapa the night of the shooting and denied seeing Leon leave the house the night of the shooting. She told Leon to leave the state so she could hire an attorney because a neighbor told her a shooting had occurred and Leon was being accused of being a participant.

In her recorded interview Garcia stated she received a phone call from a friend who told her to get out of the house because Leon had shot someone and the rival gang was going to retaliate. Garcia also explained Chapa had come by between 8:00 p.m. and 9:00 p.m. on the night of the shooting. Garcia answered the door when Chapa arrived. Chapa had been beaten and he had cuts on his head and face. Chapa asked Leon to give him a ride to the hospital. Chapa said Sureños had attacked him. Leon left with Chapa.

---

[2]We will refer to Ludivinia Leon by her first name to avoid confusion with defendant. No disrespect is intended.

6.

Garcia accused Charles Rowan of shooting Gonzalez, although she did not have any proof to support her accusation.

Villagomez testified Leon did not belong to a criminal street gang. She received a phone call from Leon on the night of the shooting. In the phone call, Leon told Villagomez to pick up their mother from her house, but he did not explain why she should do so. While admitting she spoke with police, Villagomez testified she could not recall what she had told them.

In a telephone interview conducted shortly after the shooting, Villagomez stated her mother was moving from her house because of the threats heard in the community. Leon had called the night of the shooting sounding scared and told her to get their mother out of the house. She also accused Rowan of shooting Gonzalez.

When asked to explain how she came to this conclusion, Villagomez stated she had met with Leon at a shopping mall the day after the shooting. At the meeting, Leon was crying and shaking while he explained to her that a shooting had occurred and some boys were shot. Leon explained was getting ready to leave his friend's house and when he noticed some boys approaching the house. The boys were carrying crowbars, bats, and golf clubs. Leon was afraid the boys were going to jump him or beat up the car. The boys were blocking the street in one direction, so Leon left in the opposite direction. Leon found a truck blocking the street in that direction. A friend also was in the car. A confrontation ensued and the friend took out a gun and fired at the group of boys. One of the boys fell and could not get away. Leon asserted he did not shoot the gun. Leon eventually accused Rowan of firing the gun. Villagomez and Garcia then went to Rowan's house and confronted him. Rowan denied any involvement, although to Villagomez he looked nervous and frightened.

Regarding the events on the night in question, Ludivinia testified Chapa showed up at Leon's house that evening bleeding from the head. Garcia was sleeping at the time. Ludivinia did not like Chapa, so she went into the bedroom while Leon dealt with Chapa.

Leon used a towel to clean Chapa's wounds. At approximately 9:00 p.m., Leon told Ludivinia he was going to the store to purchase first aid supplies and then left with Chapa. The two left in the vehicle Leon customarily drove. Leon returned approximately one hour later without Chapa.

### *Gang Testimony*

The prosecution's gang expert witness opined that Leon was a member of a criminal street gang, the victims were members of a rival gang, and the shooting was for the benefit of Leon's criminal street gang, along with the other elements of the gang enhancement.

At the time of the incident there were two Sureño criminal street gangs in the Orange Cove area -- the Varrio Loco Sureños and the Pure Loco Sureños. Another gang in the area was the Varrio Orange Cove Rifa, which was a Bulldog gang. Leon was a "Bulldog Gang member, VOCR." Chapa merely hung around with the Bulldogs. Diaz was a Sureño, while Gonzalez associated with the Sureños. Rodriguez also was a Sureño. The Bulldogs were rivals to the Sureños.

### *Defense*

Leon testified in his defense. He admitted he was a member of the Bulldogs gang. He also admitted Chapa was his friend, but denied Chapa was a member of the Bulldogs. Chapa came by his house the night of the shooting; he had blood on his face. Leon provided some first aid and offered to take Chapa to the hospital. Chapa did not want to go to the hospital, so Leon took Chapa to Rowan's house to get cleaned up. Rowan lived across the street from the house at which a party was being held, which was attended by Gonzalez, Diaz, and the rest of the group. Leon also admitted he drove to Rowan's house in the vehicle used in the shooting.

While Rowan was tending to Chapa's injuries, Leon began playing video games. While he was playing, Rowan and Chapa left the house. Rowan apparently was going to take Chapa home. The two took Leon's vehicle because Rowan's vehicle was in poor

condition and Leon's vehicle was parked behind Rowan's vehicle, preventing it from exiting the driveway.

After a while, Leon walked home (a relatively short walk) because Rowan had failed to return with his vehicle. Leon was with Ludivinia for a short time, but when she fell asleep he walked back to Rowan's house to retrieve his car. Rowan was not at home when Leon arrived. Leon played the video game while he waited. Rowan eventually called and asked his girlfriend to pick him up. Leon talked to Rowan and Chapa when they returned to the house. Rowan told Leon that he and Chapa had shot at some guys and had gotten rid of Leon's vehicle.[3] Leon felt he did not have any options at that time, even though he had not done anything wrong, so he left the state until he could get enough money to hire an attorney. He denied owning or having access to a shotgun or having any shotgun shells at his house.

### *Prosecution Rebuttal*

In rebuttal, the prosecution called Rowan as a witness. Rowan denied any involvement in the shooting, asserted he barely knew either Chapa or Leon, and provided an alibi for the time of the shootings. The prosecution also called Kriss Gibson to confirm Rowan's alibi.

### Verdict and Sentencing

The jury found Leon guilty of the murder of Gonzalez and the attempted murder of Diaz. On both counts the jury found true the allegation the crime was committed for the benefit of a criminal street gang. The jury also found true the special circumstance that Leon was an active member of a criminal street gang and that the crime was committed to further gang activities. However, the jury did not find the gun use enhancements true.

---

[3]These hearsay statements were not admitted for their truth, but only to explain Leon's state of mind and his subsequent conduct.

The trial court sentenced Leon to a term of life in prison without the possibility of parole for the murder of Gonzalez and a consecutive term of seven years for the attempted murder of Diaz.

## DISCUSSION

### Jury Instructions

Leon's first two arguments are directed at the jury instructions. He does not argue the trial court gave an erroneous instruction, or failed to give a necessary instruction. He concedes the instructions provided to the jury were appropriate. Instead, he argues the wording of two of the form instructions was incorrect, at least in the context of this case.

#### *CALCRIM No. 316*

Leon first complains about CALCRIM No. 316.[4] This instruction informs the jury that if a witness has been convicted of a crime, the jury *may* utilize that fact when evaluating the witness's testimony. The instruction further informs the jury it is up to them to decide how much weight to assign to this fact.

Leon complains the instruction was erroneous because the jury should have been informed that it *must* utilize the fact a witness suffered a prior conviction when it evaluates the witness's testimony, making the instruction mandatory instead of permissive. Leon cites as authority the well-established right to present evidence in his defense. Leon fails to recognize, however, that there is a significant difference between the right to present evidence and an instruction that aids the jury in evaluating the credibility of a witness.

---

[4]As read to the jury, CALCRIM No. 316 stated: "If a witness has been convicted of a crime, you may consider that fact in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." This instruction was not modified from that promulgated by the Judicial Council of California.

10.

Leon further argues this instruction encouraged the jury to reach a verdict without considering all of the evidence. We disagree. This instruction provides a guideline to the jury when it is evaluating the testimony of some of the witnesses. It does not instruct the jury to disregard any item of evidence. Indeed, the instruction specifically informs the jury that the weight of a witness's prior conviction is a matter for the jury to decide.

Significantly, Leon fails to consider the effect of the change to this instruction he proposes.

First, we note Leon also suffered prior convictions. Therefore, a mandatory instruction would have applied to his testimony, which was the only exculpatory evidence presented.

Second, informing the jury it must consider a witness's prior conviction renders the instruction confusing. How must the jury utilize the fact of a prior conviction? If a prosecution witness has more prior convictions than a defense witness, must the jury accept the testimony of the defense witness and reject the testimony of the prosecution witness? Is the jury now required to compare the types of prior convictions suffered by the witnesses to decide who is a more despicable individual and therefore subject to disbelief? How is the jury to utilize the age of the prior conviction? Does a recent prior conviction mean the jury must disregard a witness's testimony as opposed to an older conviction for a more serious crime? Must the jury reject the testimony of a witness it otherwise finds very credible simply because the witness suffered a prior conviction for a minor offense? Must the jury accept as true the testimony of all witnesses who have not suffered a prior conviction?

Leon cannot answer these questions, nor can we, because the evaluation of a witness's testimony involves many factors, and a prior conviction is just one of those factors. (See, e.g., CALCRIM Nos. 226, 315.) How these various factors are utilized in a case depends on which are present and deemed relevant by the jury. It is impossible to construct a list of factors the jury must apply in every case. In one case the jury may find

11.

a prior conviction destroys a witness's credibility, while in the next case it may decide the prior conviction is not relevant. That is why the instruction is permissive, not mandatory. The jury must evaluate the testimony of every witness, decide the creditability of each witness, and decide whether to believe all or part of the witness's testimony. CALCRIM No. 316 simply informs the jury of a tool it can utilize in making these determinations.

Moreover, the cases cited by Leon do not support his argument. Indeed, it is difficult to determine how the cited cases apply to the issue Leon presents. CALCRIM No. 316 does not preclude the defendant from presenting evidence, as in *Rock v. Arkansas* (1987) 483 U.S. 44 [per se rule prohibiting defendant's testimony if defendant was hypnotized violated defendant's right to testify in his or her defense], *Chambers v. Mississippi* (1973) 410 U.S. 284 [evidentiary rules that prohibited impeachment of witness called by defense violated right to due process], and *People v. Bobo* (1990) 229 Cal.App.3d 1417 [Legislature cannot deny a defendant the right to present evidence to prove he or she did not have the mental state required by the crime].

Nor does the instruction affect any defense Leon presented, as was the case in *Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091 [refusal to instruct jury on entrapment when defendant relied on the defense] and *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734 [trial court erred by precluding defendant from arguing prosecution failed to prove all elements of the crime]. Nor did the instruction prevent Leon from presenting, or prevent the jury from considering, evidence related to the credibility of prosecution witnesses, as in *Davis v. Alaska* (1974) 415 U.S. 308 [confrontation clause violated when trial court prevented defendant from cross-examining prosecution witness about juvenile conviction and his status as a probationer], and the other cited cases. Not only is Leon wrong on the merits, he has failed to provide any authority to support the argument.

### CALCRIM No. 337

The second instruction about which Leon complains is CALCRIM No. 337, which instructed the jury to disregard Rodriguez and Rowan being physically restrained when

they testified.[5] Leon argues both Rodriguez and Rowan had criminal records and their convictions should have been considered by the jury when evaluating their testimony. According to Leon, CALCRIM No. 337 conflicted with CALCRIM No. 316, thereby resulting in the jury being instructed to ignore the witness's prior convictions. We disagree.

As explained above, CALCRIM No. 316 correctly informed the jury it could consider a witness's criminal convictions in determining his or her credibility. CALCRIM No. 337 informed the jury to disregard a witness being restrained when testifying. The two instructions related to different topics and did not conflict.

Leon's argument confuses conviction of a crime with being restrained, which does not necessarily mean one has been convicted of a crime. A witness could be in custody awaiting trial when he or she testifies, and the trial may or may not result in a criminal conviction. Thus he or she being in custody does not mean the witness has suffered a criminal conviction.

Because the two instructions did not conflict, the instructions properly informed the jury it could utilize Rowan's prior conviction when evaluating his testimony, while ignoring Rowan being in custody when he testified. There was no error in instructing the jury with either CALCRIM No. 316 or 337.

---

[5]As read to the jury, CALCRIM No. 337 stated: "When Omar Rodriguez and Charles Rowan testified, they were physically restrained. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations. Evaluate the witness'[s] testimony according to the instructions I have given you."

**Lesser Included Offense**

Leon was convicted of the first degree murder of Gonzalez. He argues the trial court erred when it failed to instruct the jury that voluntary manslaughter is a lesser included offense to first degree murder because the jury could have concluded he acted in a heat of passion.

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.]" (*People v. Sedeno* (1974) 10 Cal.3d 703, 715, overruled on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 149 (*Breverman*).)

The general principles of law include instructions on lesser included offenses if there is a question about whether the evidence is sufficient to permit the jury to find all the elements of the charged offense. (*Breverman, supra,* 19 Cal.4th at pp. 154-155.) There is no obligation to instruct the jury on theories that do not have substantial evidentiary support. (*Id.* at p. 162.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.]" (*Ibid.*) Evidence is substantial if it would permit the jury to conclude the lesser offense was committed, but the greater offense was not. (*Ibid.*) The trial court must instruct on lesser offenses, even in the absence of a request for such instructions, or in the face of an objection by the defendant to the giving of the instructions. (*Id.* at pp. 154-155.)

The issue here is whether there was sufficient evidence Leon acted under a heat of passion to require a manslaughter instruction. We begin with the law related to voluntary manslaughter.

Manslaughter is the unlawful killing of a human being without malice. (§ 192.) "But a defendant who intentionally and unlawfully kills lacks malice only in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' [citation], or when the defendant kills in 'unreasonable self-defense'— the unreasonable but good faith belief in having to act in self-defense [citations]." (*People v. Barton* (1995) 12 Cal.4th 186, 199.) Voluntary manslaughter is a lesser included offense to murder. (*People v. Manriquez* (2005) 37 Cal.4th 547, 583 (*Manriquez*).)

Leon's argument relies on the heat of passion theory of manslaughter. "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' [Citation.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.)

"Thus, '[t]he heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and

15.

circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." [Citation.]' [Citations.] [¶] '"To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'" [Citation.]' [Citation.]" (*Manriquez, supra,* 37 Cal.4th at p. 584.)

Here, the trial court did not err in failing to instruct the jury that voluntary manslaughter is a lesser included offense to murder because there was no evidence to support the subjective component of heat of passion manslaughter. Leon suggests the jury could have concluded he was provoked to act when his life-long friend, Chapa, was beaten up by a member of the Sureños criminal street gang. Leon's testimony, however, precluded any such finding. First, Leon testified he was not at the scene of the shooting, therefore he denied his acts were the result of his outrage at the beating suffered by Chapa. Second, Leon testified that while he was Chapa's friend, Chapa was a drunk who had a big mouth that repeatedly resulted in Chapa being beaten up. Leon confirmed he did not "feel like [he] needed to go seek revenge" as a result of Chapa having been beaten. Therefore, there was no evidence to suggest Leon fired at Gonzalez and Diaz because his judgment was impaired by a heat of passion.

Leon's argument that the jury may have inferred he acted in a heat of passion is more logically directed at the objective component of heat of passion manslaughter: an ordinary reasonable person in Leon's position may have been so aroused that he or she would lose reason and judgment. While we do not necessarily agree with this assertion, the absence of any evidence that Leon subjectively acted under a heat of passion, i.e., he acted without reason and judgment, precluded the consideration of voluntary

16.

manslaughter because both the objective and subjective components must be present. Accordingly, the trial court did not err.[6]

**Fines and Fees[7]**

Leon contends two errors occurred in the trial court regarding fines and fees. According to Leon, the first error pertains to the court security fee imposed pursuant to section 1465.8. The trial court imposed a $40 court security fee and then suspended the fee because Leon was sentenced to a term of life in prison without the possibility of parole. The abstract of judgment correctly indicates the $40 fee but fails to reflect the suspension of the fee. Leon asserts the abstract of judgment must be corrected to reflect this fact.

The People agree an error occurred, but not the error identified by Leon. The People argue the trial court incorrectly calculated the court security fee, as well as the court facilities fee imposed pursuant to Government Code section 70373. The trial court imposed a $30 court facilities assessment and also ordered the assessment stayed because Leon was sentenced to a term of life in prison without the possibility of parole.

Section 1465.8, subdivision (a)(1) requires an assessment of a $40 court security fee "shall be imposed on every conviction for a criminal offense .…" In identical language, Government Code section 70373, subdivision (a)(1) provides that a $30 court facilities assessment "shall be imposed on every conviction for a criminal offense .…"

Leon was convicted of the murder of Gonzalez and the attempted murder of Diaz. Because Leon suffered two convictions, the People assert he must pay a court security fee

---

[6]Leon also argues the cumulative prejudice that resulted from the above three "errors" requires reversal. Since the trial court did not err, we necessarily reject this argument.

[7]Leon also argued in his opening brief that the abstract of judgment erroneously failed to award him credit for time served pending judgment. Leon withdrew this argument when the trial court corrected the error after Leon's request to do so.

17.

for each conviction, for a total of $80, and a court facilities fee for each conviction, for a total of $60. Moreover, the People assert these fees cannot be stayed, even though Leon received a sentence of life without the possibility of parole.

The language found in Penal Code section 1465.8, subdivision (a)(1) and Government Code section 70373, subdivision (a)(1) is clear. The trial court must impose these assessments on every conviction. Every case we have located has reached the same conclusion. (See, e.g., *People v. Crittle* (2007) 154 Cal.App.4th 368, 370-371 [trial court required to impose fee for each conviction]; *People v. Schoeb* (2005) 132 Cal.App.4th 861, 865 [same].) Leon does not cite any authority that would permit the trial court to ignore this mandatory language.[8] Moreover, the People are correct that the trial court does not have authority to stay these assessments. (*People v. Woods* (2010) 191 Cal.App.4th 269, 272-273.) Accordingly, we conclude the trial court erred when it failed to impose an assessment for each conviction pursuant to both Penal Code section 1465.8 and Government Code section 70373 and when it stayed the assessments that were imposed.

The second fine addressed by Leon is the parole revocation fine pursuant to section 1202.45, subdivision (a). This section requires imposition of a parole revocation fine in "every case where a person is convicted of a crime and his or her sentence includes a period of parole …." The fine is required to be in the same amount as the restitution fine imposed pursuant to section 1202.4, subdivision (b). (§ 1202.45, subd. (a).) The trial court imposed and suspended this fine in accordance with this provision.

Leon argues, however, that because he was sentenced to a term of life in prison without the possibility of parole, the fine should not have been imposed. The People maintain the fine was imposed properly and suspended because, in addition to the term of

---

[8]Leon did not address this issue in his respondent's brief.

life in prison without the possibility of parole, Leon also was sentenced to a term of seven years for the attempted murder of Diaz.

In *People v. Brasure* (2008) 42 Cal.4th 1037, the Supreme Court held that a section 1202.45 parole revocation fine should be imposed when a determinate prison term under section 1170 is imposed in addition to a sentence of death. "Section 3000, subdivision (a)(1) provides that such a term 'shall include a period of parole.' Section 1202.45, in turn, requires assessment of a parole revocation restitution fine '[i]n every case where a person is convicted of a crime and whose sentence includes a period of parole.' The fine was therefore required, though by statute and the court's order it was suspended unless and until defendant was released on parole and his parole was revoked. [Citation.]" (*Brasure,* at p. 1075.) Our case is indistinguishable, and therefore we are compelled to follow *Brasure*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The trial court's order was correct.

## DISPOSITION

The assessments imposed pursuant to Penal Code section 1465.8 and Government Code section 70373 are vacated and the matter is remanded to the trial court to impose assessments as required by the respective statutes. The judgment is affirmed in all other respects.

_____
CORNELL, Acting P.J.

WE CONCUR:


_____
GOMES, J.


_____
DETJEN, J.

19.